In re INTERNATIONAL HORIZONS, INC., et al., Debtors.

WESTERN PUBLISHING COMPANY, INC., Appellant,

v.

INTERNATIONAL HORIZONS, INC., et al., Appellees.

Civ. A. No. C82–93.

United States District Court,
N. D. Georgia,
Atlanta Division.

June 30, 1982.

David G. Bisbee, Robert A. Parker, Jr., Bisbee & Parker, Dale Schwartz and Mary Grace Diehl, Troutman, Sanders, Lockerman & Ashmore, Atlanta, Ga., for debtors.

Robert Trauner and Robert W. Scholz, Trauner, King & Cohen, Atlanta, Ga., for Western Pub. Co.

ORDER

ORINDA D. EVANS, District Judge.

Debtor International Horizons, Inc. is the parent holding company of a group of corporations engaged in one enterprise, the production and sale of English language learning systems to consumers overseas. The other Debtors, and several other corporations not now in bankruptcy, are subsidiaries responsible for one or more steps in the process of preparing and selling these learning systems.[1] Western Publishing Co. ("Western") is the printing concern hired by Debtors to prepare many of the books and other materials sold by Debtors and their affiliates overseas. This appeal involves the relative rights of Debtors and Western to certain goods produced by Western to Debtors' specifications.

1.  *Facts*

Debtors customarily furnished Western with original artwork and designs (the "Original Artwork"), from which Western produced films, negatives, plates and color separation materials (the "Intermediate

<hr>

1. For a fuller description of the companies engaged in this enterprise and their interrelationships, *see* the Court's Order in *Bank of America, N. T. & S. A. v. International Horizons*, No. C81–873A (N.D.Ga. Sept. 23, 1981).

Products"). Western then used these Intermediate Products in the manufacture of the finished product. Neither the Original Artwork nor the Intermediate Products have any function other than the production of the Debtors' finished books and materials. At the time Debtors filed their reorganization petitions, Western had in its possession a substantial amount of finished product and work-in-process (collectively "Finished Goods"), as well as the Original Artwork and the Intermediate Products. Debtors had not paid for the Finished Goods.[2] Debtors then began to purchase some of the Finished Goods for cash from time to time; in each case the Bankruptcy Court would authorize the use of cash collateral for this purpose.

On August 31, 1981, Debtors filed an adversary proceeding against Western in the Bankruptcy Court, in four counts. The first three counts demanded the turnover to Debtors of the Finished Goods, the Intermediate Products, and at least some of the Original Artwork, respectively.[3] On December 9, 1981, the Bankruptcy Court granted partial summary judgment to Debtors and ordered turnover of the materials sought in the first three counts. 15 B.R. 798. The Bankruptcy Court established certain conditions to protect Western. Western was to retain a security interest in all the items turned over, and in certain promissory notes obtained by Debtors in exchange for the Finished Goods. Western admits that it has no interest in the Original Artwork in Count III; however, it appeals the Bankruptcy Court's ordering the turnover of the Finished Goods and the Intermediate Products. Western raises two arguments on appeal, a legal issue that applies only to the turnover of the Finished Goods,[4] and a factual issue concerning the turnover of the Intermediate Products.

*2. The Finished Goods, the Bankruptcy Code and the UCC*

■ At the heart of this case are three sections of the new Bankruptcy Code. Under 11 U.S.C. § 542, a debtor is entitled to the turnover of "property that a trustee may sell, use or lease under section 363" if such property is in the possession of others. Section 363 provides that the trustee may sell, use or lease "property of the estate," subject to certain protections for others who claim interests in the property. "Property of the estate," according to 11 U.S.C. § 541(a)(1), includes "all legal or equitable interests of the debtor in property as of the commencement of the case." The primary issue before the Court is whether Debtors' interest in the Finished Goods is sufficient to bring these items into the section 541(a)(1) definition of "property of the estate"; if it is, then section 542 permits the turnover order issued by the Bankruptcy Court.

The Bankruptcy Court found that Debtors had a "special property and an insurable interest" in the Finished Goods under Uniform Commercial Code § 2–501(1), Ga.Code Ann. § 109A–2–501(1), and that this interest was a sufficient one to justify a turnover order.[5] Western contends that this

---

**2.** Debtors apparently did pay the costs of producing the Intermediate Products. *See* Western's Brief in Support of Appeal at 10. Western contends that this does not necessarily entitle Debtors to possession of the Intermediate Products, however. *See* discussion in Part 3 of this Order.

**3.** Count IV concerned certain abortive settlement agreements between the parties. This dispute has not yet been decided by the Bankruptcy Court, and is not part of this appeal.

**4.** The Bankruptcy Court did not distinguish between the Finished Goods and the Intermediate Products in its turnover order, nor did it make clear the nature of Debtors' interest in the Intermediate Products. However, the Bank-

ruptcy Court's reliance on Debtors' "insurable interest" in the Finished Goods, *see* discussion in part 2 below, seems inappropriate for the Intermediate Products.

**5.** Debtors assert that the Bankruptcy Court also found that they had a copyright interest in the Intermediate Product that justified turnover of the Finished Goods. The Bankruptcy Court did mention the UCC § 2–501 interest *and* the alleged copyright interest in framing the question facing the court. Order dated December 9, 1981 at 3. However, the turnover order contains no analysis of the copyright issue, and the Bankruptcy Court's ultimate holding was that "IH has a legally recognized interest . . . through the clear identification of said proper-

type of interest is an insufficient basis for a turnover order. The relationship between UCC § 2–501(1) and 11 U.S.C. § 542 apparently is a question of first impression for this or any other court.

Under UCC § 2–501(1), Ga.Code Ann. § 109A–2–501(1), "the buyer obtains a special property and an insurable interest in goods by identification of existing goods as goods to which the contract refers...." According to the Bankruptcy Court, the Finished Goods had been identified to the contract between Western and Debtor before Debtors filed their petitions,[6] and thus Debtors had "a special property and an insurable interest" in the Finished Goods at the commencement of the case. The Finished Goods, therefore, are "property of the estate" within the meaning of section 541(a)(1), hence they are "property that the trustee may sell, use or lease" under section 363, and consequently they are property subject to turnover under section 542.

Western argues that the "special property and an insurable interest" under UCC § 2–501(1) does not render the Finished Goods themselves the property of the estate. The Finished Goods, according to Western, are simply goods ordered by Debtors but never paid for. Western points out that the UCC does not provide a buyer with any substantive rights as to identified goods (other than the right to insure them, presumably) until the seller becomes insolvent and certain other conditions are met. *See* UCC § 2–502, Ga.Code Ann. § 109A–2–502. Under the UCC, then, Western is entitled to retain the Finished Goods until Debtors pay

cash for them, unless Western should become insolvent; the Bankruptcy Code should not change this result, Western argues. Western's position is that *only* Debtors' "special property and an insurable interest" is property of the estate under section 541(a)(1), and the debtors-in-possession are entitled to possession only of that interest.

The Court has had occasion to consider a related issue in an earlier appeal in these bankruptcies. In *Bank of America, N. T. & S. A. v. International Horizons*, No. C81–873A (N.D.Ga. March 30, 1982), Debtors and Bank of America, a secured creditor, both had interests in certain funds; Debtors had legal title, but Bank of America claimed an equitable interest. Bank of America argued, as Western does here, that its interest in the funds was far stronger than that of Debtors, and therefore the entire property could not pass into the hands of Debtors. The Court rejected this argument, noting the congressional intent to gather all interests of the Debtor, no matter how weak, into the estate. The Court further held that the fact that Debtors had title to the funds was sufficient to bring the funds into the estate for all purposes, to be used by Debtors subject to the procedural and substantive safeguards of section 363. *Id.* at 4. The Court relied in part on the reasoning of *In re Alpa Corp.*, 11 B.R. 281, 289 (Bkrtcy.D. Utah 1981), that "no matter how limited the pre-bankruptcy rights and interests of the debtor in certain property, that property, once determined to be property of the estate, is subject to the rights given the

ty." *Id.* at 4. The Court must conclude, therefore, that the Bankruptcy Court relied solely on UCC § 2–501(1), and not on any alleged copyrights held by Debtor, in finding an interest sufficient to justify turnover.

6. The Bankruptcy Court did not specify the manner in which this identification to the contract took place, but presumably those Finished Goods that were completed were "future goods ... marked or otherwise designated by the seller as goods to which the contract refers." UCC § 2–501(1)(b), Ga.Code Ann. § 109A–2–501(1)(b). A leading treatise suggests that identification of specially manufactured goods to the contract "probably" occurs "once such

items are completed," but further suggests that work-in-process of such goods is *not* identified to the contract. 3A R. Duesenberg & L. King, *Bender's Uniform Commercial Code Service, Sales and Bulk Transfers under the U. C. C.* § 9.05[3], at 9–24, 9–25 (1980). At least one court has disagreed, holding that identification of specially manufactured goods to the contract occurs at the time of the first step in production. *Little v. Grizzly Manufacturing*, 636 P.2d 839 (Mont.1981). However, Western has not suggested to the Bankruptcy Court or this Court that the work-in-process was inadequately identified to the contract, so the Court will not consider this point further.

debtor-in-possession or trustee in bankruptcy as found in sections 542, 543, 363 . . . ." *Bank of America*, slip op. at 4–5. The Second Circuit has adopted a more elaborate version of the *Alpa* reasoning that this Court utilized in *Bank of America*. *United States v. Whiting Pools, Inc.*, 674 F.2d 144 (2d Cir. 1982) (Friendly, J.).

The Second Circuit considered the legislative history of the Bankruptcy Code in some detail. *Id.* at 152–55. It determined that sections 542, 363 and 541(a)(1) operate to permit the debtor to obtain possession of "property repossessed or executed upon by a secured creditor or held by a pledgee following the debtor's default and prior to his bankruptcy." *Id.* at 156. The Court agrees with this interpretation, which is consistent with *Alpa* and *Bank of America*.[7] In this case, however, the Bankruptcy Court took this reasoning one step further. Rather than applying it against a secured creditor who had possession of property to which a debtor held title and other interests, the Bankruptcy Court here applied it against a party who owned *all* the interest in the property except Debtors' UCC § 2–501(1) "special property and an insurable interest." The real question facing the Court is whether this extension of the reasoning of *Whiting Pools, Bank of America*, and *Alpa* is justified.

Weighing against the extension of the *Whiting Pools* reasoning to this case is the particularly weak interest of Debtors in these Finished Goods. The drafters of the UCC considered the identification of the goods to the contract to serve a "limited function." Official Comment 4 to UCC § 2–501.[8] Furthermore, the mere identification of goods to a contract by itself creates only one substantive rights in buyers such as Debtors; substantive rights other than the right to insure the goods do not accrue until the conditions of section 2–502, which includes the seller's insolvency and some payment by the buyer, are met. *See* Official Comment 1 to UCC § 2–501. The conditions specified in UCC § 2–502 were not met in this case, of course.

The primary argument in favor of extending the *Whiting Pools* reasoning to these Finished Goods, according to the Bankruptcy Court, is a practical one. As the Bankruptcy Court noted, "The Debtors' current inventory of IH products will be substantially depleted by the time this Order is entered. The Court notes that without adequate inventory, the successful reorganization of the debtors will be severely hampered." Order dated December 9, 1981 at 2.[9] The Bankruptcy Court apparently felt that the spirit of the reorganization provisions of the Bankruptcy Code demanded that the turnover provisions of section 542 be applied to the Finished Goods. *Cf. In re Barsky*, 6 B.R. 624, 627 (Bkrtcy.E.D. Pa.1980) (in a tax seizure case similar to *Whiting Pools*, the court ordered turnover because "if the Commonwealth is permitted to retain the debtors' assets, it is undisputed that the debtors will be forced into liquidation"; this violates "the essence of chapter 11"). This rationale, of course, has no limits; the reorganization might be "ham-

---

7. It is inconsistent with the approach taken by the only other Circuit Court of Appeals to consider the specific issue decided in *Alpa, Bank of America*, and *Whiting Pools*, the relative right of the Debtor and a secured creditor (or a constructive secured creditor such as the Internal Revenue Service) to property whose title is vested in the debtor at the time of the filing of the petition. *Cross Electric Co. v. United States*, 664 F.2d 1218 (4th Cir. 1981). The *Cross Electric* court adopted the narrower view argued by Western in this case, that turnover of *possession* is inappropriate if the debtor was not entitled to possession on the day he filed his petition. *Id.* at 1220. The *Whiting Pools* court was not persuaded by the *Cross Electric* reasoning, *see* 674 F.2d at 145, and this Court

agrees with Judge Friendly that the *Cross Electric* approach is inconsistent with the rehabilitative purposes of the Bankruptcy Code.

8. The Georgia legislature, unlike those of many other states, did not enact the Official Comments to the UCC along with the statute itself. However, the intent of the drafters is still relevant evidence that the Court can consider.

9. However, the Bankruptcy Court did not explain why it could not simply continue its practice of authorizing periodic cash payments for the Finished Goods rather than order them turned over, thereby changing Western from a cash-basis supplier to a secured creditor.

pered" without further bank loans, but the Bankruptcy Court could not order Debtors' banks to extend further credit, citing merely the spirit of the Code. The Court therefore rejects this results-oriented approach, and turns to the question of whether the turnover is nonetheless legally justified.

This question is an extremely close one. The decisive factor, in the Court's opinion, is the nature of Debtors' interest in the Finished Goods. The very terminology used by the drafters of the UCC—"a *special* property ... interest"—indicates that they intended it to bestow upon its holder only limited rights. Property law has always recognized that one whose property is repossessed by a constructive secured creditor as in *Whiting Pools,* or one who has title but not the equitable interest as in *Bank of America,* has a substantial property interest in the property at issue. The same is not true of holders of the traditional pre-UCC insurable interest, which had nothing to do with the present or future right to possession of the property. The Court is convinced, both by the use of the adjective "special" in the text of section 501(1) and by the "limited function" language in Official Comment 4, that the drafters of the UCC did not intend to expand the very limited pre-UCC concept of the insurable interest; section 501(1) merely allocates this limited interest between the seller and buyer, without creating any further substantive rights.

Debtors, of course, contend that no matter *how* limited, the interest is "property of the estate" and therefore the entire property is subject to turnover. By the same reasoning, property which a debtor had an option to purchase at the time he filed for bankruptcy would be subject to turnover as well, and presumably without the payment contemplated in the option agreement.[10] A debtor who obtained turnover of property subject to an option would be using section 542 to increase his property rights, rather than to marshal his assets. The Court does

not believe that Congress intended this result. By the same reasoning, the Court does not believe that section 542 was intended to permit Debtors in this case to obtain goods that, prior to the bankruptcy, Western customarily prepared to Debtors' specifications and held until Debtors paid for them.

There are certain "interests" in property, the Court concludes, that are so insignificant that they do not render the entire property subject to turnover under 11 U.S.C. § 542. The Court need not and does not attempt to draw an analytical line between those interests sufficient to trigger section 542 and those that are insufficient; the Court merely holds that the "special property and an insurable interest" created by UCC § 2–501(1) does not subject the entire property to turnover.

### 3. *The Intermediate Products, Identification, and the UCC Once Again*

The Bankruptcy Court did not distinguish between the Finished Goods and the Intermediate Products in its turnover order; it held that the identification of both to the contract created an interest sufficient to justify turnover. Order dated December 9, 1981 at 4. Western contends that this was error, because there exists a factual dispute regarding whether Debtors had any rights at all in the Intermediate Products.

There are two possible ways that Debtors might have acquired an interest in the Intermediate Products: by identification of the Intermediate Products to the contract, or by paying for their production. The contract between the parties, which appeared on the back of Western's order forms, provided, "all intermediate materials used in the production of the product, such as artwork, type, plates (including lithographic plates), engravings, electrotypos, negatives, positives, and other items are not

---

**10.** In such a case, the Bankruptcy Court would be obliged to provide the owner of the property with "adequate protection," of course. *See* 11 U.S.C. § 363(e). As this case indicates, such

"adequate protection" need not be, and probably would not be, the cash payment for the property required in the option agreement.

part of this agreement unless otherwise agreed in writing." Exhibit A to Complaint at ¶ 5. Thus the contract by its own terms excluded the Intermediate Products from its coverage; consequently, it is clear that those goods could not have been identified to the contract within the meaning of UCC § 2–501. Nor have the parties or the Court found any cases holding that such intermediate materials, as opposed to the goods contracted for, were identified to the contract. The Court concludes that the Bankruptcy Court erred in holding that the Intermediate Products were identified to the contract.

Western does not dispute Debtors' assertion that Debtors paid the costs of the production of the Intermediate Products. *See* Western's Brief in Support of Appeal at 10. Western nonetheless argues that this does not give Debtors any rights in the Intermediate Products, because the custom and usage of the printing trade, and the course of dealing between Debtors and Western, gave the printer sole ownership and right to possession of such Intermediate Products. *See* Affidavit of Howard L. Anderson dated November 9, 1981 at ¶ 3. The UCC specifically permits evidence of course of dealing and usage of a trade to supplement the terms of a written agreement. UCC § 1–205(3), Ga.Code Ann. § 109A–1–205(3). The existence and scope of a trade usage, however, are questions of fact. *Id.* § 1–205(2), Ga.Code Ann. § 109A–1–205(2). Debtors' position, of course, is that their payments for the production of the Intermediate Products gives them ownership and the right to possession. The Court concludes that Western's usage of the trade and course of dealing arguments raise a disputed issue regarding a material fact, and that summary judgment was inappropriate on this theory as well.[11]

11. Debtors rely on *In re Fairway Records, Inc.*, 6 B.R. 162 (Bkrtcy.E.D.N.Y.1980) in support of their theory that they are entitled to possession of the Intermediate Products because they paid the cost of production. Debtors' reliance is misplaced; the "air masters" at issue in *Fairway Records* were property that the debtors

### 4. *Conclusion*

On the basis of the foregoing analysis, the Court REVERSES the Bankruptcy Court's granting of Summary Judgment in favor of Debtors with regard to Counts I and II. The Court REMANDS this action to the Bankruptcy Court, for the entry of summary judgment in favor of Western as to Count I, which concerns the Finished Goods, and for a trial on the merits as to Count II, which concerns the Intermediate Products.

SO ORDERED.

supplied to another party for that party to duplicate, rather than being intermediate materials produced from the debtors' property. The "air masters" were comparable to the Original Artwork in this case, not the Intermediate Products.