FIRST TENNESSEE BANK, NATIONAL ASSOCIATION, Plaintiff/Appellant,

v.

GRAPHIC ARTS CENTRE, INC., Keeler/Morris Printing Company, Inc., Lithocraft Studios, Inc., J. Lewin Bookbinding Company, Inc., Fordyce Promotional Services, Inc., Minuteman Press Printing, Inc., Defendants/Respondents.

No. 62049.

Missouri Court of Appeals, Eastern District, Division Two.

July 20, 1993.

Motion for Rehearing and/or Transfer to Supreme Court Denied Aug. 26, 1993.

Application to Transfer Denied Sept. 28, 1993.

Charlene N. Kass, St. Louis, Richard Gossett, John Speer, Monique Nassar, Chattanooga, TN, for plaintiff/appellant.

John F. Cowling, James E. Mello, Kenneth J. Mallin, James Michael Cox, St. Louis, for defendants/respondents.

GRIMM, Judge.

This replevin action arises out of a dispute as to who was entitled to possession of 264,848 games. Plaintiff bank claimed the games pursuant to a security agreement given by its debtor, the distributor of the games.

Defendants, as suppliers or manufacturers of the games, claimed they were entitled to the games. They alleged they had an artisan's lien, a warehouseman's lien, and an equitable lien.

Pursuant to Rule 99 governing replevin, and following a hearing, the Hon. Robert G. Dowd, Jr. entered an Order of Delivery in Replevin. Bank took possession and sold the games.

Following trial on the merits, the Hon. Richard J. Mehan found Bank had not met its burden of proof that it was entitled to the games. Judge Mehan therefore entered judgment for defendants.[1] Bank appeals; we affirm.

## I. Background

### A. Contractual Arrangements and Course of Performance

In this court-tried case, we set forth the facts in a light most favorable to the judgment. We defer to the trial court's resolution of conflicting evidence. *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976).

This case basically involves five different organizations. Three of these organizations were involved a year or longer before the other two. The first three organizations were headed by Mark Walbridge, Bill Struthers, and Jack Bobo.

In 1983, Mr. Walbridge of Vancouver, Washington, began developing an idea for a VCR videotape game called Video Trivalities. In producing and marketing this game, he used various organizations including the services of a printer, Mr. Struthers of Clackamas, Oregon.

In the summer of 1985, Mr. Walbridge met Mr. Bobo of Clarksdale, Mississippi, a potential distributor for his game. Mr. Bobo, an attorney, had experience in raising equity for projects. Several organizations, including one formed by Mr. Bobo, entered into various written distribution agreements with Mr. Walbridge.

In late 1984, Mr. Walbridge developed the concept for a VCR sports game called The VCR Quarterback Game. The game was a combination videotape and board game. Because of its potential, he formed Interactive VCR Games, Inc. (Originator).

---

1. The trial of this case began on August 28, 1989, and was conducted on 13 different days, ending on January 25, 1990.

   In addition, portions of 20 depositions were submitted by written memorandum on December 4 and 11, 1989, as well as on April 3 and 6, 1990. Objections to some of the submitted depositions were filed December 11, 1989. No ruling was made on these objections.

   Proposed findings were submitted by the parties in the fall of 1991. On January 15, 1992, the trial court issued an 82 page decision, which is indexed and well-organized. Bank's after-trial motion was denied April 28, 1992.

National Football League Films and Properties permitted Originator to use NFL highlights and licensed the game to Originator. By 1986, a prototype had been developed.

Originator produced the videotape for the game. Ultimately, Originator orally contracted with Mr. Struthers of Minuteman Press Printing, Inc. (Producer) to produce or procure the other component parts and assemble the finished games.

Mr. Bobo formed VCR Enterprises, Inc. (Distributor) to market the original game. In the early stages of their relationship, Distributor paid Originator for the completed games in different ways. At times it prepaid and at times the games were shipped COD. Either way, the games were shipped to Distributor in Mississippi for warehousing and shipping to retailers.

Before going further, we point out that neither Originator nor Distributor are parties to this action. However, it is necessary to refer to them in order to fully understand the relationship of all the participants.

When the Quarterback Game was developed, Originator and Distributor entered into different arrangements. By this time, Distributor was basically the sole marketer and distributor of Originator's products. The written agreement set forth their financial relationship. It provided, among other things, that (1) Originator was the seller and Distributor was the purchaser; (2) the sales price for each game was "FOB Manufacturer;" [2] (3) Distributor would pay a portion of the game's cost immediately after it was manufactured; and (4) after certain advertising expenses were paid, Distributor would pay the balance due Originator once a year.

The fourth organization, a bank, now enters the picture. To enable Distributor to furnish this financing, Distributor contacted First Tennessee Bank of Memphis (Bank). In October, 1986, Bank furnished Distributor with a seven million dollar line of credit. Distributor executed a security agreement in Bank's favor, pledging, among other things, all of its inventory.

In addition to The VCR Quarterback Game, Originator developed and obtained licenses for other sports games which were produced by Producer and marketed by Distributor in a similar fashion. All these games, including the Quarterback game, are referred to collectively as "sports games."

In addition to sports games, the parties were involved in a detective-style mystery game, 221 B Baker Street. However, the relationship of the parties was not the same. A New Zealand company contacted Distributor about this game and Distributor entered into a licensing agreement with that company. Distributor had Originator make the videotapes for the game and had Producer produce the other component parts and assemble the game. Distributor told Producer how many games to produce.

With the aid of numerous local suppliers, Producer originally performed its part of the work in Oregon. In June, 1987, the fifth organization became involved. At that time, Producer contracted out various production responsibilities to several corporations in St. Louis, known collectively as the Graphic Arts Centre.

Graphic Arts Centre is a "corporate holding company." Its subsidiaries are Keeler/Morris Printing, Lithocraft Studios, J. Lewin Bookbinding, Co., and Fordyce Promotional Services. Each of the five is a Missouri corporation; they are all located in one building at 5800 Fee Fee Road in St. Louis.

Keeler/Morris did printing work and leased the first warehouse for the project, known as the Park Steed warehouse in Earth City. The games were manufactured and stored there pending shipment. Lithocraft Studios developed and proofed film. J. Lewin Bookbinding Co. cut, trimmed, and assembled games. Fordyce Promotional Services assembled games and shipped them.

A few months into the project, Graphic Arts Centre leased a second warehouse; it

---

**2.** In this document, Originator was referred to   as "Manufacturer."

was located on Shoreline in Earth City. Raw materials and component parts were stored there.

In May, 1988, Graphic Arts Centre leased a third warehouse, located on Goodfellow in St. Louis. All of the finished games were moved to this warehouse. The games were in this warehouse at the time of this replevin action.

Shipping instructions were given exclusively by Distributor. Distributor would send the shipping instructions for drop shipping to retailers by overnight delivery to the Park Steed warehouse. The instructions included packing slips, freight bills, labels, and designations of freight lines. The shipping and handling were performed by one of the Graphic Arts companies, Keeler/Morris. Keeler/Morris billed Producer for this service, who in turn billed Distributor.

The games were paid for under a procedure [3] apparently agreed upon by Originator, Producer, Distributor, and Bank. Producer would count the number of completed games manufactured at the end of each day. Periodically, an independent company, SLT Warehouse Company, would verify the inventory count. It would then issue an inventory certificate indicating the number of games on hand.

On approximately a weekly basis, Producer, on behalf of Originator, would invoice Distributor and Bank for the week's completed games. Each sports game was priced separately, ranging from $15.90 to $17.20. For example, Originator and Distributor agreed that Distributor would pay $15.90 for each Quarterback game. Of that sum, however, Bank would advance only $9.75 per game. Bank would send the $9.75 to Producer, Producer would retain $3.65 for its production charge, and Producer would forward the remaining sum to Originator.

The money advanced Originator through Producer would be credited against the total amount Distributor owed Originator. At the end of the year, Distributor was to pay Originator the balance of the amount due on the completed games produced, minus one-half of the advertising charges.

On the Baker Street games, Producer would invoice Distributor and Bank weekly $6.83 for each completed game. Bank would pay the full invoice price to Producer. Producer would retain $2.93 for its production charge and send $3.90 to Originator for its production charge for the videotape.

## B. Replevied Games

In the summer of 1987, Producer claims Originator orally contracted with it to buy 500,000 sports games to be produced in St. Louis. In early July, the order was increased to 845,000 sports games. At about the same time, Producer claims Distributor ordered 100,000 Baker Street games.

Producer ordered raw materials to make the 500,000 sports games. Producer then issued purchase orders to Graphic Arts for 450,000 sports games and 100,000 Baker Street games.

Several adverse situations arose in late summer and the fall of 1987. In August, Bank notified Distributor that its line of credit expired at year-end; Bank wanted Distributor to obtain another source of funding. The players in the National Football League went on strike and the stock market crashed in October. The National Football League licensed a competing VCR football game. As a result, the market for the sports games deteriorated.

In late October or in November, 1987, Distributor advised Originator and Producer that sales had slowed down and that production should stop. Producer called Originator and asked for instructions; a few days later, Originator called and told Producer to stop production.

In early 1988, Originator determined Distributor was in default of the exclusive distribution agreement and terminated their relationship. Distributor, with Bank's assistance, attempted to negotiate a

---

**3.** This payment procedure was used for Baker Street Games as well, except that Originator was not involved beyond its production of the videotape.

sale of the completed sports games. However, this attempt was unsuccessful.

Bank then attempted to obtain possession of the completed games. When Producer and Graphic Arts refused to turn them over, Bank brought this replevin action. The petition alleged, among other things, that (1) Producer and Graphic Arts possessed 244,234 sports games and 17,276 Baker Street games;[4] (2) the games were "rightfully the property" of Distributor; (3) Distributor had given Bank a security interest in the games; (4) Distributor had consented to the release of the games to Bank so it could sell them; (5) on July 28, 1988, Producer and Graphic Arts "wrongfully failed to surrender said property ... and said property [was] now wrongfully detained by" them; and (6) the games were worth $1,250,000.

On July 26, 1988, following a hearing, Judge Dowd entered an Order of Delivery in Replevin. Thereafter, pursuant to Rule 99.09, Producer and Graphic Arts requested a hearing. Judge Dowd conducted that hearing on August 2, 1988. At its conclusion, he reaffirmed his July 26 order. Bank took possession of the games, which it later sold for $5.00 per game.

Subsequently, following trial before Judge Mehan, the trial court concluded Bank's replevin was wrongful. The trial court stated two reasons for this conclusion. "First, the Bank failed to show that its purported security interest attached to the games in question. Second, the Bank failed to show that [Distributor] granted any rights it may have had in the games to the Bank." As a result, among other things, Bank was ordered to pay Producer the fair market value of the games replevied. On their cross-claim against Producer, the Graphic Arts Centre defendants were awarded judgment for $469,726.05 plus prejudgment interest.

## II. Replevin

■ For its first point, Bank contends that the trial court erred in finding Bank's replevin was wrongful. Bank asserts it was "entitled to take immediate possession of the completed games," and it had "rights in the completed games based on its perfected security interest and assignment of [Distributor's] interest."

■ As plaintiff, Bank has the burden of proof in this replevin case. Replevin is a possessory action. As such, Bank must prove its right to possession of the games at the time suit was filed. Stated another way, "the gist of replevin action is to test plaintiff's right to immediate possession of the chattels and defendant's wrongful detention." *Phillips v. Ockel,* 609 S.W.2d 228, 231 (Mo.App.E.D.1980). If the defendants have any interest supporting their right to immediate possession, Bank's petition must fail. *See Rankin v. Wyatt,* 335 Mo. 628, 73 S.W.2d 764, 767 (1934).

The foundation of Bank's claim to possession is an October 14, 1986 security agreement. In order to secure a line of credit, Distributor gave Bank a continuing security interest in, among other things,

> All of the [Distributor's] inventory in all of its forms, wherever located and whether now or hereafter existing, and all accessions thereto and products thereof, including raw materials, materials awaiting manufacture, work-in-process, finished products, and materials used or consumed in [Distributor's] business (collectively hereinafter "Inventory"); ....

■ Even though the security agreement exists, a security interest is not enforceable against either Distributor or third parties with respect to the collateral and does not attach until three conditions coexist. § 400.9–203(1), (2).[5] The conditions are:

> (a) the collateral is in the possession of the secured party ... or the debtor has signed a security agreement ...;
>
> (b) value has been given; and

---

**4.** The record reveals that 247,679 sports games and 17,167 Baker Street games were taken by Bank.

**5.** All statutory references are to RSMo 1986.

(c) the debtor has rights in the collateral.

§ 400.9–203(1).

There is no dispute that requirements (a) and (b) were met. However, the trial court found that Distributor did not have rights in the collateral, i.e. the games. As a result, the Bank's security interest did not attach to the games.

Neither the model code nor Missouri's Uniform Commercial Code define "rights in the collateral." Commentators suggest that the debtor's "rights in the collateral" are not generally determined by Article 9 of the code. Rather, they are determined "by Article 2, by the common law, and by other rules." 2 J. WHITE & R. SUMMERS, UNIFORM COMMERCIAL CODE, § 24–6, at 323 (3d ed. 1988).

Professors White and Summers further suggest that the

"rights in the collateral" language merely states a truism, namely that the debtor normally can only convey something once he has something, and that something may be less than the full bundle of rights that one may hold in such property. The "rights in the collateral" language serves as a kind of gateway through which one looks to other law to determine the extent of the debtor's rights, and thus the "value" he can grant to a third party by way of a security interest.

*Id.*

■ With these comments in mind, we turn to Bank's contention that it had "rights in the collateral" under Article 2 of the code. It argues the games were identified to a contract, such identification creates a "special property interest," and thus Distributor and ultimately Bank had "rights in the collateral."

Article 2 of our code provides, in pertinent part:

(1) The buyer obtains a special property and an insurable interest in goods by identification of existing goods as goods to which the contract refers.... Such identification can be made at any time and in any manner explicitly agreed to by the parties. In the absence of explicit agreement identification occurs

(a) when the contract is made if it is for the sale of goods already existing and identified;

(b) if the contract is for the sale of future goods ..., when goods are shipped, marked or otherwise designated by the seller as goods to which the contract refers; ...

§ 400.2–501.

Here, there was no explicit agreement. Further, the goods did not exist at the time of contract. Thus, identification could occur only when the goods were shipped, marked or otherwise designated by the seller. § 400.2–501(1)(b).

Identification occurred here because the goods (games) were designated. The completed games were finished, packaged, and shrink wrapped; they were ready for shipping. Producer did not fill orders for the games from any company other than Distributor. All games were designated for shipping pursuant to Distributor's orders.

Our conclusion is supported by *Reeves v. Pillsbury Co.*, 625 P.2d 440, 445 (Ks.1981). There, the Kansas Supreme Court said:

"Ordinarily identification will be made by the seller by filling an order received from the buyer. When such is the case, there is a clear manifestation of identification by the act of setting aside, packaging, or marking goods as being intended for or destined for the *particular buyer.* Thus it would appear that there is an identification when there is an intent to identify particular goods and some overt act manifesting that intent."

*Id.* (quoting 2 R. ANDERSON, UNIFORM COMMERCIAL CODE § 2–501:4, at 60–61 (2d ed. 1971)) (emphasis added).

Here, the requisite intent is derived from the fact that Distributor was the only entity that ordered and bought the games from Originator and its subcontractors. The finished games were stored, awaiting orders from Distributor. *See, e.g., Miss Celebrity, Inc. v. Dartmouth Finishing Co.*, 15 UCC Rep.Serv. 764 (N.Y.App.1974). The com-

pleted games were identified as existing goods to which the contract refers.

### A. Effect of Identification

■ Identification serves a "limited function." *See* 3 R. ANDERSON, UNIFORM COMMERCIAL CODE, § 2–501:1 cmt., at 605 (3d ed. 1983); *Holstein v. Greenwich Yacht Sales, Inc.*, 404 A.2d 842, 844 (R.I.1979). Identification gives the buyer a "special property and an insurable interest in the goods." § 400.2–501(1); *see Crocker Nat'l Bank v. Ideco Div. of Dresser Indus.*, 839 F.2d 1104, 1108 (5th Cir. 1988). "By virtue of the special property of the buyer in the identified goods he may, even though title has not passed to him, recover the goods in the event of the seller's insolvency [pursuant to § 400.2–502], or upon the seller's default or repudiation [pursuant to § 400.2–711(2)(a) ], and he has a limited right to recover the goods by replevin [pursuant to § 400.2–716(3) ]." 3 R. ANDERSON, *supra*, § 2–501:16, at 612.

However, these remedial rights derived from identification are available only upon misconduct by the seller. *See* §§ 400.2–502, 400.2–711(2)(a), 400.2–716(3). Here, buyer, rather than seller, failed to fully perform under the contract. Thus, these remedial provisions are unavailable to Distributor and Bank and therefore fail to provide them the requisite "rights in the collateral." *See, e.g., In re International Horizons, Inc.*, 34 UCC Rep.Serv. 114, 119–20 (N.D.Ga.92); *Central Prod. Credit Ass'n v. Hopkins*, 810 S.W.2d 108, 113–14 (Mo.App.S.D.1991). Cases relied upon by Bank, e.g., *Holstein*, 404 A.2d at 843, and *In re McFarland*, 131 B.R. 627 (E.D.Tenn 1990), *aff'd* 943 F.2d 52 (6th Cir.1991), are not applicable here because in each the seller was the defaulting party. Identification by itself does not confer "rights in the collateral" to Distributor or Bank.

### B. Constructive Possession

■ Bank also claims that Distributor "had rights in the collateral because of its constructive possession of the completed Games." However, it does not support this

statement with any facts showing how Distributor had constructive possession.

In contrast, the trial court found, and we agree, that Bank failed to show Distributor had constructive possession. The trial court pointed out that SLT Warehouse Company periodically certified the number of games on hand. The trial court, however, observed that SLT's certificates specifically state the certificate is "NOT a Warehouse Receipt or a Document of Title."

Moreover, neither Originator nor Producer were parties to the inventory certificates. Thus, it is difficult for us to perceive how the certificates could support Bank's constructive possession claim.

Further, the warehouses in which the games were stored were leased by either Graphic Arts Centre or Keeler/Morris, not Distributor. Distributor did not have keys to or employees at either warehouse. Thus, Distributor did not have constructive possession of the completed games.

### C. Estoppel

■ Bank also claims Producer is estopped "to deny the security interest of the Bank in the completed Games and this estoppel creates 'rights' sufficient to satisfy § 9–203." Bank argues Producer (1) treated the completed games as being subject to Distributor's rights, (2) was aware of Bank's security interest, (3) received $3,937,014.64 for completed games, and (4) participated in certifying the number of games completed. In support, it relies solely on *In re Pubs, Inc. of Champaign*, 618 F.2d 432 (7th Cir.1980).

*Pubs* is not applicable here. In *Pubs*, two men who were the sole shareholders of the Pubs corporation agreed to purchase restaurant equipment. They intended to borrow money personally to buy the equipment, give the bank a security interest in the equipment, and then transfer the equipment to the corporation in exchange for stock in Pubs. *Id.* at 435.

On November 5, one of the men signed the note at the bank and gave a security interest in the equipment. The other man was not then available, and did not sign

until November 16. The bank changed the date of the note from November 5 to November 16. In the meantime, on November 9, the men had conveyed the equipment to the corporation; the conveyance stated the collateral was transferred subject to the bank's security interest. *Id.*

About 18 months later, the corporation filed voluntary bankruptcy. The equipment was sold. The trial court found that the two men did not have "rights in the collateral" when they gave the security interest to the bank. On appeal, the court reversed, finding that the corporation was estopped to deny the bank's security interest. *Id.* at 438.

Unlike the facts in *Pubs,* Producer was not a party to the October 14, 1986 security agreement between Distributor and Bank. Here, Bank apparently relied on Distributor's representations and warranty that it owned the inventory. Nothing in the record indicates Producer represented to Bank that Distributor owned the inventory. Nor does the record disclose any action taken by Bank to assure itself that Distributor had either title to, or possession of, the inventory. Producer is not estopped from denying Bank's security interest in the completed games.

### D. Payment for Games

█ Bank further claims Distributor had "paid for the completed Games" and as a result acquired rights in those games. To determine if the games had been paid for, we made four different calculations.

First, we considered Producer's Exhibit 45, which reflects games that were manufactured and either shipped or taken by Bank, but not paid for. This calculation reflects Distributor owed $199,686.63 on the replevied games.

Second, we considered (1) Producer's Exhibit 47, which reflects total games produced according to warehouse records, (2) Producer's Exhibit 45, and (3) the total amount Bank had paid on behalf of Distributor. This calculation indicates Distributor owed $198,674.36 on the replevied games.

Third, we assumed that Bank's payments were first applied to games already shipped, rather than to the replevied games. This assumption is supported by evidence that on a weekly basis Producer would invoice Distributor and Bank on behalf of Originator for the week's completed games and receive payments based on those invoices. With that assumption, we considered Producer's Exhibits 15–1, 16–1, 17–1, and 18–1, which are inventory records made by Producer's employees, as well as Graphic Arts Exhibit HHH, which is the itemization of replevied games. This calculation indicates Distributor owed $199,686.63.

Fourth, we considered Bank's Exhibit L, a December 22, 1987 letter Producer wrote to Distributor. It set forth "an accounting of [Producer's] records as to the production of the four games." It indicates 10,467 "completed [sports] games NOT paid for as of this date" and 633 "completed [Baker Street] games NOT paid for as of this date." Based on this exhibit, Distributor owed $106,376.64.

The trial court found "the Bank's assertion of payment in full is not supported by the facts." There is ample evidence to support the trial court's finding.

### E. Conclusion

For the reasons stated above, we conclude that the trial court did not err in holding that the Bank's replevin was wrongful. Bank did not have "rights in the collateral" of the completed games. Bank's first point is denied.

### III. Conversion

In its second point, Bank alleges trial court error in holding that Bank wrongfully converted the games. In view of our disposition of Bank's first point, this point is deemed moot.

### IV. Damages

In its third point, Bank alleges trial court error in awarding Producer $3,045,752.00 in damages. It contends that (1) the award ignores payments made to Producer, (2) the

award does not reflect the fair market value of the games, and (3) the court did not use the proper measure of damages.

■ Bank first contends that the award ignores payments made to Producer. At first blush, it appears Producer is being paid more than it is entitled to for the work and materials supplied and, as a result, is "unjustly enriched."

However, this appearance disappears upon closer examination. Producer did not claim to be the owner of the completed games. Rather, it consistently acknowledged that Originator was the owner of the sports games and Distributor was the owner of the Baker Street games. Producer claimed only a lien on the completed games.

■ Where, as here, a defendant in a replevin action has only a special interest in the property, and the plaintiff is a stranger, the entire value may be recovered by the special owner. *Dilworth v. McKelvy*, 30 Mo. 149, 154–55 (1860); *Williams v. McGill*, 705 S.W.2d 636, 639–40 (Mo.App. S.D.1986). Here, Producer had a special interest in the property, i.e., a lien. Bank, having no "interest" in the completed games, was a "stranger."

In such situations, the property's value should be determined without regard to the value of the special interest. *Dilworth*, 30 Mo. at 155. The special interest owner, however, does not get a windfall. Rather, the special interest owner "is answerable over to the general owner for whatever interest remains after the special claim is satisfied." *Id.; see also Church v. Richfer Corp.*, 618 S.W.2d 29, 31 n. 3 (Mo. banc 1981).

■ We now turn to Bank's second contention that the award does not reflect the fair market value of the games. The testimony concerning value ranged from $5.00 to $15.00 per game, with the trial court placing a value of $11.50 per game. When evidence is conflicting, we defer to the trial court. *Murphy*, 536 S.W.2d at 32.

■ In its final contention, Bank alleges the trial did not use the proper measure of damages. From its argument, we deduce Bank contends that the value should

have been determined at the time of trial, rather than at taking. Replevied property that has been sold is valued as of the date of taking. *Phillips v. Ockel*, 609 S.W.2d 228, 232 (Mo.App.E.D.1980). Point denied.

### V. Remaining Points

Bank's four remaining points all concern the Graphic Arts Centre defendants.

In its brief, Producer suggested that these points "need not be decided because the amount of the [Graphic Arts Centre] lien is included in the unappealed cross-claim award against [Producer] and in favor of the Graphic Arts defendants.... Due to the priorities in recovery set up by the trial court, ... affirmation of the trial court's replevin decision satisfies any lien claim that the Graphic Arts defendants might have." In its reply brief, Bank tacitly agreed, for it said issues involving Producer's damages "would clearly remain."

We have examined each of those points. We conclude the points are moot and do not need to be addressed.

The trial court's judgment is affirmed.

CRANDALL, P.J., and PUDLOWSKI, J., concur.