IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
April 12, 1999 Session

## CONISTER TRUST LTD. v. BOATING CORPORATION OF AMERICA and VILLAS-AFLOAT, LTD.

**Appeal from the Chancery Court for Sumner County**
**No. 94C-412     Tom E. Gray, Chancellor**

---

**No. M1998-00949-COA-R3-CV -  Filed March 14, 2002**

---

The buyer of three boats that were to be built pursuant to specific instructions defaulted on payment for the second and third boats by failing to pay the entire purchase price of the boats.  The seller resold the two boats and recovered its damages caused by the buyer's breach.  A creditor of the buyer, who furnished funds for the purchase of the first two boats, sought the excess proceeds from the sale of the second boat asserting that it had an unperfected security interest.  Because the buyer did not attain rights in the collateral sufficient to meet the requirements for attachment of a security interest, the creditor is not entitled to distribution of the proceeds under Article 9 of the Uniform Commercial Code.  Instead, the rights of the buyer and seller are governed by Article 2.  The creditor was entitled to assert the buyer's right to restitution of partial payments, and the seller was entitled to recover its damages from the resale of the two boats.  The seller also had a right of setoff which it exercised to recover losses on the third boat from moneys realized in the sale of the second boat. Accordingly, we affirm the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court**
**Affirmed and Remanded**

PATRICIA J. COTTRELL, J., delivered the opinion of the court, in which BEN H. CANTRELL, P.J., M.S., and WILLIAM C. KOCH, JR., J., joined.

Todd E. Panther, Nashville, Tennessee, for the appellant, Conister Trust Ltd.

Steven C. Douse, Nashville, Tennessee, for the appellees, Boating Corporation of America and Villas-Afloat, Ltd.

### OPINION

The issue presented to the court is whether Boating Corporation of America ("BCA") or Conister Trust, Ltd. ("Conister") is entitled to proceeds realized from the sale of a boat.  Conister,

a British financing institution, sued Villas-Afloat, Ltd. ("Villas-Afloat") and BCA seeking surplus proceeds that BCA withheld from the sale of a boat built by BCA for Villas-Afloat. Conister had provided financing to Villas-Afloat for two boats to be built by BCA, and BCA sold the second after Villas-Afloat failed to pay. After the sale, BCA applied proceeds from the sale to moneys owing on a third boat it had built for Villas-Afloat. The trial court found that no surplus proceeds existed from the sale of the second boat, and Conister appealed.

In 1989, Robin Bamford, director of the newly formed Villas-Afloat, approached Conister about financing the purchase of several boats. Like Conister, Villas-Afloat was a business located on the Isle of Man in Great Britain. Villas-Afloat intended to purchase the boats and offer them to vacationers in the Mediterranean on a time share basis.

BCA was a Tennessee corporation which built houseboats, boats and cruisers.[1] These boats were marketed through a network of some 23 dealers in the U.S. and Canada which ordered and bought the boats and sold them to consumers. The boats were typically built to order and delivered only after full payment by the dealer.

In 1989, Mr. Bamford approached BCA about becoming BCA's exclusive distributor in Europe. In June, after a telephone conversation between the parties, BCA confirmed its agreement with a letter indicating that Mr. Bamford's company would be the exclusive European dealer of BCA boats with a minimum annual order of six boats. In August 1989, acting under this agreement, Mr. Bamford requested that BCA send him invoices for two boats. His correspondence stated:

> Although we will have sufficient funds for the first two boats, we are taking advantage of an initial loan offered to us to leave capital free for operation costs.

In late November 1989, Villas-Afloat paid a $25,157.68 deposit to BCA on the first boat ("Boat I"). The deposit was accompanied by a confirmation facsimile advising BCA that the balance would be from a "finance house." On December 1, 1989, BCA sent Villas-Afloat Invoice Number 1766 in the amount of $196,934.75 for Boat I. This invoice provided detailed information on the equipment and components to be used on the boat and their cost. On December 6, BCA sent invoice number 1771, which was equally detailed and for the same amount, to cover the second boat ("Boat II").

In December 1989, Conister and Villas-Afloat entered into two conditional sales agreements. The documents purport to represent a sale by Conister, called "seller" in the documents, to Villas-Afloat, called "buyer" therein. They included a section to be signed by a "dealer," offering to sell the goods to Conister. Although BCA's name had been filled in as the dealer, no signature was included for BCA. Conister never forwarded the documents to BCA for signature. Conister was to

---

[1] BCA sold its assets and went out of business in September 1997.

advance up to £100,000 per boat[2] and under the agreements, Villas-Afloat was to be liable for the balance. Villas-Afloat sent the invoices it had received from BCA to Conister.

On December 13, 1989, pursuant to the conditional sales agreements between Conister and Villas-Afloat, Conister wired £200,000 (approximately $320,800) to BCA. The confirming facsimile to BCA for this wire transfer stated in part:

> Subject: Invoice 1771 and 1766
> Comments: Confirmation of funds of £200,000.00 sterling have been sent to your account by SWIFT to your Banker.

Conister preceded this fax with a telephone call to BCA's president, Clyde C. Head. The Conister representative who made the call, Michael James Lees, recalled that he "phoned Boating Corporation of America in the afternoon to obtain and confirm the banking details of Boating Corporation of America." These were the first communications between Conister and BCA. At no time did these two entities enter into any kind of a written contractual arrangement regarding the boats.

On December 15, 1989, BCA released Boat I to Villas-Afloat, having received full payment for that boat.[3] This left BCA holding the remaining funds originating from Conister and Villas-Afloat.[4]

On January 19, 1990, Villas-Afloat ordered six additional boats from BCA for the Olympic Games Committee.[5] Mr. Bamford's correspondence requested:

> From the funds we have already advanced to you, please allocate $25,000 to the deposit on the first of these six boats which are required by the 1992 Olympic Committee. We are at present attending to the final contract details as all six boats are being financed through a lending institution for the Olympic Committee.

---

[2] At the exchange rate then prevailing, this sum amounted to $160,400 per boat.

[3] BCA applied the $25,157.68 deposit from Villas-Afloat and $171,777.07 of the proceeds wired from Conister to the invoice price of $196,934.75.

[4] That amount was $149,002.93.

[5] On December 22, 1989, Mr. Bamford faxed BCA a copy of a letter of intent from the Barcelona Olympic Organizing Committee confirming that Villas-Afloat's product had been selected as the official motor yacht of the 1992 Olympic games. The Committee required six additional vessels, each with a professional skipper.

As requested by Villas-Afloat, BCA used $25,000 of the amount remaining from payment for Boat I as a deposit on a third boat ("Boat III"). BCA applied the remaining balance to Boat II.[6] Due to changes and additions requested by Villas-Afloat, $14,191.88 was added to the price of Boat II. Thus, as of January 30, 1990, BCA's records showed that $87,123.70 remained owing on Boat II, which was completed on February 13, 1990.

In January of 1990, Villas-Afloat failed to make its first payment to Conister under the Conditional Sales Agreement. Villas-Afloat also failed to make any payments to BCA on Boat II.

On February 21, 1990, E. J. Thorn, Conister's chief executive, corresponded with BCA's president, Clyde Head. The letter stated:

We have today determined an agreement with Villas-Afloat Limited in respect of a Mediterranean Motor Yacht, believed to be recently completed and in your possession. This letter serves as your authority, from this company as owners, to retain possession of this vessel and await our further instructions.

Mr. Head responded on March 12, 1990, with a letter to Conister's counsel stating:

We received a letter from E. J. Thorn . . . concerning the ownership and possession of the second Harbor Master Motoryacht which we constructed for Villas-Afloat. This motoryacht is owned by and is in the possession of Boating Corporation of America. This boat had been sold to Villas-Afloat with partial funding provided by Conister. . . . It is my understanding that Conister has funded the purchase of these Harbor Master Motoryachts for Villas-Afloat. Could you please supply me with documentation to demonstrate Conister's ownership position in this vessel? The motoryacht under discussion was finished on February 13, 1990 and we anticipated immediate shipment. We are awaiting shipping instructions and stand ready to ship the boat upon payment of the outstanding balance.

Conister's counsel responded the following day, March 13, 1990, by sending BCA copies of the conditional sales agreements and explaining that Villas-Afloat was in default. No mention was made of what BCA should do with Boat II.

After Mr. Head received the agreements, he noticed that BCA's name had been filled in under a provision of the documents which stated:

To Conister Limited . . .

I/We offer to sell you the Goods described in the Schedule hereto and request you to supply them on Conditional Sale to the proposed Buyer named in the schedule

---

[6]That amount was $124,002.93

-4-

hereto.  The Goods referred to are my/our sole property unencumbered and have not been the subject of any previous transaction with the proposed Buyer.  I/We warrant that the initial Payment shown in the Schedule above has not been increased in any way beyond the actual amount that will be paid in cash by the proposed Buyer or the fair market value of goods traded in to me/us.

NO INVOICE OR OTHER DOCUMENTATION INFERRING A SALE OR AN AGREEMENT TO SELL HAS BEEN ISSUED BY ME/US AND WE CERTIFY THAT THIS TRANSACTION HAD NEITHER BEEN OFFERED TO NOR REFUSED BY ANY OTHER COMPANY, PERSON OR FIRM.  I/WE FURTHER CERTIFY THAT THE MEANING AND EFFECT OF CLAUSE 5 OVERLEAF HAVE BEEN FULLY EXPLAINED TO THE PROPOSED BUYER BY ME/US AND I/WE DECLARE AND CERTIFY THAT THE GOODS ARE FIT FOR THEIR INTENDED USE.

The date, November 12, 1989, was filled in, but a space for the signature of the dealer was blank. When Mr. Head saw BCA's name written in under this provision, he was concerned and sought legal counsel.

BCA continued work on Boat III because Mr. Bamford indicated that he was continuing to seek additional financing.  On April 4, 1990, BCA sent Villas-Afloat an invoice in the amount of $209,964 for Boat III.  Mr. Bamford failed to obtain new financing and made no more payments to BCA.  On July 4, 1990, Conister informed BCA:

> We have been extremely patient in allowing the search for alternative funding over this period, but we are now looking at an increased probability that the boat which you still have in your possession will have to be realized.

Conister offered two options: (1) to pay BCA the amount outstanding, take possession of the boat and arrange for its sale after its conversion to U.S. specifications or (2) "agree to a sum with you at which we would be prepared to relinquish our interest in the boat."  Conister expressed a preference for the second option.

On October 17, 1990, BCA's counsel notified Mr. Bamford, Conister, and Conister's counsel that a balance of $87,100.73 plus interest and storage charges remained unpaid on Boat II and if BCA did not receive payment, it would sell the boat at auction.  The letter also stated:

> In the event that the boat is sold at an auction, the proceeds from the sale will first be applied to cover the storage fees, interest expense and the outstanding principal balance.  The remaining amount of the proceeds of the sale will be paid to either Conister Ltd. or to Villas as those two parties shall jointly instruct me in writing.  If I do not receive joint instructions from said parties, I will file an interpleader action in the appropriate court in Nashville, Tennessee. (emphasis in original).

Villas-Afloat did not respond to this letter. Conister's counsel inquired about how the sale would be conducted. The letter closed with the statement, "I would advise that title to the yacht rests with my client." BCA's counsel responded with information about the sale and asked for clarification of the above quoted statement, stating:

> If your comments refer to whether the sale proceeds that may result from the sale or auction of the boat belong to Conister or Villas-Afloat, then I understand your comment. However, as I expressed in my letter of October 17, 1990, the boat in question had never been fully paid for and therefore title to it remains with my client. . . . Also, please understand that I am not in a position to verify, one way or the other, whether your client or Villas-Afloat has title to the boat. To date, the only "proof" that I have to verify Conister's interest in the boat is a copy of a conditional sales agreement between Conister and Villas-Afloat which your client forwarded to my client under previous cover. However, not being a solicitor or a barrister in England, I cannot confirm or deny your client's legal interest in the boat. But, understand that the only contractual arrangement my client has concerning the boat is with Villas-Afloat.

On November 26, 1990, BCA sold Boat II for $134,551.51, leaving a surplus, according to BCA, of $48,899.85 above the amount owed it for Boat II.[7]

BCA's counsel informed Conister of the sale and surplus in a December 7, 1990, letter which stated:

> [Our client] has instructed us to pay the remaining proceeds from the sale to the rightful owner of said proceeds. However, in light of our confusion concerning who has the legal right to these proceeds, we respectfully request that your client, Conister, and the appropriate representative of Villas-Afloat, send us joint payment instructions informing us who to pay, etc.

BCA completed Boat III in late December 1990 and shortly thereafter sold Boat III. After Boat III was sold, BCA calculated its losses arising from its dealings with Villas-Afloat at $94,373.21.[8] BCA then applied the $48,889.85 credit from the sale of Boat II to cover its losses on Boat III. BCA calculated that even with the addition of that amount it faced a shortfall.[9]

---

[7] BCA arrived at this number by crediting Villas-Afloat with $6,500 for items deleted from the original invoice and adding $4,660.46 in interest charges and $397.50 for a generator hush cover.

[8] This figure includes a $57,566.25 shortfall in the resale from Boat III, $4,400 in storage and handling costs, $4,406.96 in fees and expenses for resale, $24,000 in costs incurred in modifying Boat III for the American market, and $4,000 in pro-rata development expenses. BCA sold Boat III for $152,407.75.

[9] BCA calculated its credits as $48,889.85 in surplus from the sale of Boat II, $25,000 deposit on Boat III,

(continued...)

Conister demanded the $48,889.85[10] surplus from the sale of Boat II, but the money was not forthcoming. In August, 1994, Conister commenced this action, seeking a declaration "that as to all persons in the world Conister possesses a superior claim to the surplus proceeds from the sale of the second boat and a judgment for $48,889.85." Conister also sought damages of $25,000, which it alleged that BCA wrongfully applied toward Boat III, and $11,377.07, which BCA allegedly wrongfully applied to satisfy the balance on Boat I.[11]

After a trial, the court found:

> that there has not been any unjust enrichment and that there are no surplus proceeds [but] [i]f there were any surplus proceeds the court would find that they are in fact that of Conister and that they should be paid over to Conister.

### I. Uniform Commercial Code Article 2 and Article 9 Claims

Conister does not dispute the commercial reasonableness of the sale of Boat II or the accuracy of BCA's claims for expenses and losses on that boat and does not argue that its interest in Boats I and II was superior to that of BCA. Conister simply maintains that once BCA recouped its losses on Boat II, Conister was entitled to the surplus proceeds from the sale of Boat II because:

(1)     By advancing $320,800 to BCA pursuant to the conditional sales agreement with Villas-Afloat, Conister acquired a security interest in Boat II pursuant to Tenn. Code Ann. § 47-9-107 and that such interest gave Conister rights to proceeds upon the sale of the collateral securing the loan. Conister does not assert that it perfected its security interest.

(2)     Conister's security interest in Boat II does not conflict with BCA's interest in that boat. Conister does not dispute that BCA was entitled to sell Boat II and to satisfy its lien on that boat from the proceeds of the sale. However, BCA had no right to apply the surplus proceeds from the sale to a loss resulting from a separate contract. Conister contends the building of Boat III was pursuant to a contract with Villas-Afloat which was separate from the contract for Boats I and II.

---

[9](...continued)
$3,000 in unincurred transportation costs, and $14,000 in gasoline engine substitution savings. Credits were totaled at $90,889.85, while they calculated their losses at $94,363.21. Faced with these figures, BCA concluded "that the person or the company that these funds [the $48,889.85 surplus] were due was not [a] question mark. . . . They were due to Boating Corporation of America because Villas-Afloat had caused the incursion of these expenses."

[10] This letter indicated that Villas-Afloat was "being wound up in the High Court of England."

[11] Conister has not pursued the $11,377.07 claim in this appeal.

(3) Conister's communications with BCA limited the use of the $320,800 transferred to BCA to Boat I and Boat II, and BCA's later conduct and communications confirmed its understanding of that restriction.

On the other hand, BCA contends that its building of the three boats was pursuant to a single contractual relationship with Villas-Afloat, arguing that its relationship with Villas-Afloat was an installment contract under the Uniform Commercial Code, Tenn. Code Ann. § 47-2-612(1). Consequently, BCA argues it was entitled to set off its losses on Boat III with the surplus funds from the sale of Boat II.

BCA also argues that even if there were separate contracts for Boats II and III, BCA was entitled to offset any claim by Villas-Afloat to the surplus from the sale of Boat II by any claim it had against Villas-Afloat, whether the claims arose from the same contract or not. Conister's interest in Boat II derives from Villas-Afloat and is subject to the same limitations and defenses, according to BCA. In addition, BCA asserts that Conister did not possess a security interest in Boat II and that Conister did not limit use of the £200,000 it wired to BCA to Boats I and II.

The parties' positions involve two articles of the Uniform Commercial Code, as adopted in Tennessee: Article 2 (Chapter 2 of Title 47 of Tennessee Code Annotated), dealing with sales, and Article 9 (Chapter 9 of Title 47 of Tennessee Code Annotated), dealing with secured transactions. BCA is an Article 2 seller with rights created therein, and Conister claims an Article 9 security interest. The boats in question were undisputedly goods under Article 2, and Conister argues Boat II was also collateral under Article 9. To analyze these competing interests, and the proper method to prioritize them, we must first identify each party's interest and the accompanying rights. We begin with the parties' positions.

Conister claims it is entitled to the remaining "proceeds" of the sale of Boat II under Tenn. Code Ann. § 47-9-504(1),[12] which provides that proceeds from the disposition of collateral subject to a security interest are to be distributed in the following order:

> (a) the reasonable expenses of retaking, holding, preparing for sale, or lease selling, leasing and the like and, to the extent provided for in the agreement and not prohibited by law, the reasonable attorneys' fees and legal expenses incurred by the secured party;
> (b) the satisfaction of indebtedness secured by the security interest under which the disposition is made;
> (c) the satisfaction of indebtedness secured by any subordinate security interest in the collateral if written notification of demand therefor is received before distribution of the proceeds is completed. If requested by the secured party, the holder of a

---

[12]Because this case was tried and briefed prior to the 2001 changes in Article 9, all references to statutes in Chapter 9 of Article 47 of the Tennessee Code are to those statutes as numbered prior to July 1, 2001.

subordinate security interest must seasonably furnish reasonable proof of his interest, and unless he does so, the secured party need not comply with his demand.

Conister's claim rests upon (c) above and, consequently, on its claim that it had a security interest in Boat II. "Unless otherwise agreed, a security agreement gives the secured party the right to proceeds provided by § 47-9-306." Tenn. Code Ann. § 47-9-203(3). Tenn. Code Ann. § 47-9-306(1) defines proceeds as "whatever is received upon the sale, exchange, collection or other disposition of the collateral or proceeds." BCA asserts that Conister did not have a security interest which had attached to Boat II.

BCA's position, however, is primarily based upon the rights and remedies given to a seller under Article 2. It argues that because it was entitled to offset its losses or damages caused by Villas-Afloat's default of its obligation to pay for Boats II and III against moneys it owed to Villas-Afloat, there were no excess proceeds from its arrangement with Villas-Afloat. Consequently, Villas-Afloat had no interest in the proceeds from the sale of Boat II which it could have transferred to Conister.

The UCC addresses, to some extent, the interaction between Article 2 and Article 9. In particular, certain formalities otherwise requisite to the enforceability of a security interest are waived for those interests arising under the article on sales, Article 2. Tenn. Code Ann. § 47-9-203. In addition:

> A security interest arising solely under the chapter on sales (chapter 2 of this title) . . . is subject to the provisions of this chapter except that to the extent that and so long as the debtor does not have or does not lawfully obtain possession of the goods:
>
> > (a) no security agreement is necessary to make the security interest enforceable; and
> > (b) no filing is required to perfect the security interest; and
> > (c) the rights of the secured party on default by the debtor are governed by the chapter on sales (chapter 2 of this title) in the case of a security interest arising solely under such chapter . . . .

Tenn. Code Ann. § 47-9-113.

The interests which arise solely under Article 2 include those clearly denominated security interests by Article 2 as well as other interests not so clearly labeled. "Whenever Article 2 refers to a nonconsensual security interest arising by operation of law or purely as a result of the sales transaction (i.e., without any intent to create a secured credit transaction), section 9-113 will probably apply." WILLIAM D. HAWKLAND, HAWKLAND UNIFORM COMMERCIAL CODE SERIES § 9-113:2 (2001) [hereinafter HAWKLAND UCC SERIES].

The drafters call certain interests that arise under the Article on sales "security interests" even though they generally arise by operation of law. An example is the interest of a buyer exercising a right of rejection under section 2-711(3). Also, there is a series of rights that are not labeled security interests under Article 2 but are similar to security interests. Examples of these are the seller's rights under sections 2-702 [seller's remedies on buyer's insolvency] and 2-705 [stoppage of goods in transit].

Section 9-113 plainly addresses the extent to which Article 9 governs those Article 2 interests, there called "security interests." Comment 2 to section 9-113 suggests that this section may also address seller's rights which are like security interests but which are not labeled as such by Article 2.

JAMES J. WHITE & ROBERT S. SUMMERS, UNIFORM COMMERCIAL CODE § 30-11, at 75 (4th ed. 1995).

The result of disputes between Article 2 interests and Article 9 interests is not subject to uniform rules or interpretations. *See* WHITE & SUMMERS, *supra,* §30-11, at 76-77 ("few Code cases cast little light on such issues");[13] Thomas H. Jackson & Ellen A. Peters, *Quest for Uncertainty: A Proposal for Flexible Resolution of Inherent Conflicts between Article 2 and 9 of the Uniform Commercial Code*, 87 YALE L.J. 907 (1978). Nonetheless, where a buyer defaults, it would appear that a seller's rights would be governed by Article 2's provisions establishing the seller's remedies rather than Article 9's default provisions. 8 HAWKLAND UCC SERIES § 9-113:2; *In Re Ault*, 6 B.R. 58 (Bankr. E.D. Tenn. 1980).

Before we reach any question of priority of competing interests created under the different articles, an analysis of the rights or interests claimed by each party is necessary to determine if such competing interests actually exist.

II. Rights and Remedies Under Article 2

Under Article 2 of the UCC, when a buyer wrongfully fails to make a payment due on or before delivery, the aggrieved seller has several options to protect itself from loss and may, as BCA did here, withhold delivery of the goods and resell and recover damages. Tenn. Code Ann. § 47-2-703. If the seller resells the goods in good faith and in a reasonable manner, neither of which is challenged herein, the seller may recover the difference between the resale price and the contract price together with allowable incidental damages, less expenses saved by buyer's breach. Tenn.

---

[13]As an example of those issues where little light has been cast, White & Summers pose the following inquiry, "seller stops or withholds, and lien-creditor of the buyer seeks to levy on the goods in seller's hands. Do sections 9-201 and 9-301 control, or is the solution to be found in Article 2, or in still other law?" White and Summers also direct the reader to the Jackson and Peters article as "cast[ing] considerable light."

Code Ann. § 47-2-706(1).[14]  According to the evidence, BCA calculated its damages for each boat in accordance with the statute, and Conister does not dispute these calculations.[15]

BCA never relinquished possession of Boat II or Boat III to Villas-Afloat; it retained possession of them pending full payment.[16]  This action was consistent with the UCC.  Unless otherwise agreed, tender of payment by the buyer is a condition precedent to seller's duty to tender and complete delivery.  Tenn. Code Ann. § 47-2-511(1).  A seller "is not required to give up possession of the goods until he has received payment" absent an agreement for credit.  Tenn. Code Ann. § 47-2-310, cmt. 2.  The fact that BCA retained possession strengthens its position and broadens its range of remedies under Article 2.  A seller in possession of the goods when the buyer breaches the contract can rely on the goods for its recovery.  *In re Ault*, 6 B.R. at 67.

The rights or remedies given to a non-breaching seller under Article 2 are akin to the common law seller's lien.[17]  *See* Jackson & Peters, *supra,* 87 YALE L.J. at 914-15.  We are of the opinion that a seller who never delivers goods because the buyer fails to tender the required payment simply remains the owner of the goods.  *See* WHITE & SUMMERS, *supra*, § 7-6, at 375.  Nonetheless, we are aware that a non-breaching seller's interests may also constitute "a security interest arising solely under the chapter on sales," Tenn. Code Ann. § 47-9-113, or rights similar to security interests, as discussed above.  Whichever title is given to the seller's rights, they clearly arise from Article 2.

Tenn. Code Ann. § 47-2-706's listing of the types of damages available to the seller indicates the seller would not be entitled to retain partial payments which exceed its damages after resale.  Otherwise, the seller could be unjustly enriched.  The damages allowed are designed to "put the seller in as good a position as performance would have done."  Tenn. Code Ann. § 47-2-708(2).

---

[14]The seller is not required to account to the defaulting buyer for any profit on the resale.  Tenn. Code Ann. § 47-2-706(6); *see also* cmt. 11.  Since the eventual sales of Boat II and Boat III resulted in a lower price than the contract with Villas-Afloat, the profit provision is not involved.

[15]BCA's agreement with Villas-Afloat for Boat II set the price at $196,934.75, but changes in specifications increased the price by $14,191.88, making the total $211,126.63. BCA sold the boat for $134,551.51. Under the statute, BCA was entitled to recover the difference in the two prices as well as its costs of sale and storage. After deducting those damages from the amounts BCA had been paid toward Boat II by Villas A-float, BCA recovered $48,889.85 in excess of its damages. As to Boat III, the contract price with BCA was $209,964, and the boat sold for $152,407.75, and BCA sustained additional expenses for storage and handling, modification of the boat for the American market, and other expenses.  BCA gave credit for unincurred transportation costs and other savings.  Thus, BCA was entitled to recover from Villas-Afloat the difference in the contract price and the resale price ($57,556.25), and incidental damages ($36,806.96), less savings ($17,000).  That amount was $77,363.21.  Against that amount due to BCA from Villas-Afloat, BCA applied the $48,899.85 from the sale of Boat II and the $25,000 deposit on Boat II, leaving a deficit.

[16]BCA released Boat I to Villas-Afloat because it received full payment.  Conister later repossessed Boat I and resold it.

[17]"A lien, in its broadest sense, is a legal claim or charge on real or personal property used as security for the payment of some debt or obligation." *Keep Fresh Filters, Inc. v. Reguli*, 888 S.W.2d 437, 443 (Tenn. Ct. App. 1994).

Accordingly, Article 2 also addresses the rights of a breaching buyer who made partial payments to a refund of some or all of such partial payments. Tenn. Code Ann. § 47-2-718(2). That provision entitles the breaching buyer to restitution of its down payment according to the formula set out therein. *R.E. Davis Chem. Corp. v. Diasonics, Inc.*, 826 F.2d 678, 681 (7th Cir. 1987).

> Where the seller justifiably withholds a delivery of goods because of the buyer's breach, the buyer is entitled to restitution of any amount by which the sum of his payments exceeds . . . (b) . . . twenty percent (20%) of the value of the total performance for which the buyer is obligated under the contract or five hundred dollars ($500), whichever is smaller.

Tenn. Code Ann. § 47-2-718(2). However, the amount of restitution is limited by the seller's damages. Subsection (3) provides that "the buyer's right to restitution under subsection (2) is subject to offset to the extent that the seller establishes (a) a right to recover damages under the provisions of this chapter . . ." *Id.* Thus, a breaching buyer may receive as restitution its deposit, down payment, or partial payment to the extent any of it remains after the seller exercises its rights or remedies under Article 2, including resale and deduction of authorized damages, except the seller retains at least $500. *Madsen v. Murrey & Sons Co., Inc.*, 743 P.2d 1212, 1215-16 (Utah 1987); *Wendling v. Puls*, 610 P.2d 580, 585-86 (Kan. 1980); *Anheuser v. Oswald Refractories, Inc.*, 541 S.W.2d 706, 711-12 (Mo. Ct. App. 1976). This restitution to a breaching buyer is consistent with the now general rule:

> That a person who breaks his contract may still be entitled to the restitution of the benefits that he conferred on the other party before the breach, once the victim of the breach has been fully compensated by an award of damages. An award not reduced by the benefit received by the plaintiff would be too large to be compensatory, and so it would be punitive, and punitive damages are rarely . . . awarded in contract cases; and so a victim of a breach of contract who wants to keep the contract breaker's money above and beyond the amount necessary to compensate for the breach may be said to be "unjustly enriched", entitling the contract breaker to restitution.

*Micro Data Base Sys., Inc. v. Dharma Sys., Inc.*, 148 F.3d 649, 656 (7th Cir. 1998) (citations omitted).

Article 2 also addresses partial payments by buyers in one other instance. A buyer who has paid a part of the price of goods in which the buyer has a "special property" may make tender of any unpaid portion of the price and recover the goods from the seller, if the seller becomes insolvent within ten days of receipt of the partial payment. Tenn. Code Ann. § 47-2-502. Villas-Afloat did not tender the full purchase price, and BCA did not become insolvent in the relevant time period. Thus, this provision has no direct applicability to the case before us. However, its mention of "special property" refers to another potential source of interest for a buyer, and the comments to this section provide clarification of that interest.

Under Tenn. Code Ann. § 47-2-501 a buyer obtains "a special property" and an insurable interest in goods by identification of the goods to the contract. Other than triggering the right to recover identified goods from an insolvent seller, as set out in Tenn. Code Ann. § 47-2-502, and other potential remedies not relevant, the extent and effect of this "special property" is not explained. *See* Jackson & Peters, *supra*, 87 YALE L.J. at 937 n.100. What is clear, however, is that whatever a "special property" is, it is not a security interest. The UCC's definition of security interest states, "The special property interest of a buyer of goods on the identification of those goods to a contract for sale under § 47-2-401 is not a 'security interest,' but a buyer may also acquire a 'security interest' by complying with chapter 9 of this title." Tenn. Code Ann. § 47-1-201. Official Comment 2 to Tenn. Code Ann § 47-2-502 reaffirms this principle, even where a buyer has made partial payment and the seller becomes insolvent, stating "The question of whether the buyer also acquires a security interest in identified goods and has rights to the goods when insolvency takes place after the ten-day period provided in this section depends upon compliance with the Article [Chapter] on Secured Transactions (Article [Chapter] 9)." Villas-Afloat did not attempt to comply with the requirements of Article 9.

### III. Rights and Remedies Under Article 9

Conister's position rests fundamentally on its claim that it had a security interest pursuant to the Uniform Commercial Code. Under the UCC, the term security interest is defined as "an interest in personal property or fixtures which secures payment or performance of an obligation." Tenn. Code Ann. § 47-1-201(37).[18] A security interest can only be enforced against the debtor or third parties if it has "attached."[19]

> (1) Subject to the provisions of § 47-4-208 on the security interest of a collecting bank, § 47-8-321 on security interests in securities and § 47-9-113 on a security interest arising under the chapter on sales, a security interest is not enforceable against the debtor or third parties with respect to the collateral and does not attach unless:
>
> > (a) the collateral is in the possession of the secured party pursuant to agreement, or the debtor has signed a security agreement which contains a description of the collateral . . . ; and
> >
> > (b) the value has been given; and

---

[18]Conister asserts it had a purchase money security interest in Boat II because the money it advanced was used by the debtor to purchase the collateral. *See* Tenn. Code Ann. § 47-9-107(b); *John Deere Co. v. Production Credit Ass'n of Murfreesboro*, 686 S.W.2d 904 (Tenn. Ct. App. 1984). A purchase money security interest must also meet the requirements of a security interest. *Id.* at 907; *Mays v. Brighton Bank*, 832 S.W.2d 347, 349 (Tenn. Ct. App. 1992).

[19]Attachment is different from perfection, and Conister does not assert that it perfected its interest by filing.

> (c) the debtor has rights in the collateral.
>
> (2) A security interest attaches when it becomes enforceable against the debtor with respect to the collateral. Attachment occurs as soon as all of the events specified in subsection (1) have taken place unless explicit agreement postpones the time of attaching.

Tenn. Code Ann. § 47-9-203.

There is no question that Conister gave value.[20] Because Boat II was never in Conister's possession, it must demonstrate that Villas-Afloat signed a security agreement that meets the requirements of § 47-9-203(1)(a). A "security agreement" is defined in Tenn. Code Ann. § 47-9-105(1)(l) as "an agreement which creates or provides for a security interest." Further, for purposes of this statute, "any description of personal property . . . is sufficient whether or not it is specific if it reasonably identifies what is described." Tenn. Code Ann. § 47-9-110. If the conditional sales agreement signed by Villas-Afloat is sufficient to meet the requirement of subsection (1)(a),[21] which we do not decide, then the remaining hurdle for Conister is to show that Villas-Afloat had "rights in the collateral" as required in subsection (c). *Mays*, 832 S.W.2d at 349.

---

[20]"Value" is defined in § 47-1-201, which states:

> . . . a person gives "value" for rights if he acquires them: (a) in return for a binding commitment to extend credit or for the extension of immediately available credit whether or not drawn upon and whether or not a charge-back is provided for in the event of difficulties in collection . . . or (d) generally, in return for any consideration sufficient to support a simple contract.

Tenn. Code Ann. § 47-1-201. Conister extended credit to Villas-Afloat, then, Conister "gave value" within the meaning of the Code.

[21]Conister asserts that the conditional sales agreement signed by Villas-Afloat sufficiently described the collateral, here the boats, to meet the requirements of the Code. Although the conditional sales agreement between Conister and Villas-Afloat is not a formal security agreement, the UCC does not require such formality. Other less formal documents, standing alone or in various combinations, have been held to satisfy the requirements of § 47-9-203. *See Wray v. Estate of James Franklin Wray*, No. 01A01-9509-PB-00392, 1996 Tenn. App. Lexis 300, at *3 (Tenn. Ct. App. May 22, 1996) (no Tenn. R. App. P. 11 application filed); WHITE & SUMMERS, *supra,* at § 23-3. In *Wray* the court held that a hand written note that stated, "Wayne Wray first lienholder $4500 payable on demand, no interest" in addition to a notation on the certificate of title that Wayne Wray was the first lienholder both of which were signed by the debtor and included a description of the collateral, a car, were, in combination, sufficient to satisfy the security agreement requirement. *Wray*,1996 Tenn. App. Lexis 300, at *1-*2. The sales agreement at issue herein is signed by the debtor in that it is signed by Mr. Bamford, the director of Villas-Afloat, on its behalf. Further, the sales agreement contains a section entitled "Particulars of Goods Including Model and Serial numbers" after which Boats I and II are described and serial numbers given on the two respective documents. However, under the document, Conister agrees to sell the boat to Villas-Afloat, even though Conister had no contractual agreement with BCA for the manufacture or sale of the boat.

The phrase "rights in the collateral" is not defined in the Code. *Kunkel v. Sprague Nat'l Bank*, 128 F.3d 636, 642-43 (8th Cir. 1997); *First Tenn. Bank, Nat'l Assn v. Graphic Arts Centre, Inc.*, 859 S.W.2d 858, 864 (Mo. Ct. App. 1993); *Peterson v. First Tenn. Bank*, 1985 Tenn. App. Lexis 3059, at *14 (Tenn. Ct. App. July 30, 1985) (no Tenn. R. App. P. 11 application filed). Generally, issues such as ownership, possession, and their indices such as title, physical control, and risk of loss enter into consideration of whether a debtor has sufficient rights in the collateral so as to allow attachment of a security interest. *See Kunkel*, 128 F.3d at 641 (courts consider factors such as the extent of the debtor's control over the property and whether the debtor bears the risk of ownership); *Kinetics Tech. Int'l Corp. v. Fourth Nat'l Bank*, 705 F.2d 396, 399 (10th Cir. 1983) (debtor's control); *Chambersburg Trust Co. v. Eichelberger*, 588 A.2d 549, 552-53 (Pa. 1991) (debtor had risk of ownership); *Hong Kong & Shanghai Banking Corp. v. HFH USA Corp.*, 805 F. Supp. 133, 141-42 (W.D.N.Y. 1992) (court looked to whether title passed because title is indicative of rights buyer has to dispose of goods); *Peterson*, 1985 Tenn. App. Lexis 3059, at *14 (where true ownership lies with another party, mere acquisition by debtor of possession is not enough, but owner was estopped to deny creation of security interest where owner gave debtor permission to use goods as collateral).

The importance of possession has been noted in many cases. *See* Douglas G. Baird & Thomas H. Jackson, *Possession and Ownership: An Examination of the Scope of Article 9*, 35 STAN. L. REV. 175, 202-06 (1983). Both Article 2 and Article 9 place significance on the physical location of contract goods as an indicator of statutory rights. Jackson & Peters, *supra,* 87 YALE L.J. at 912. Courts in Tennessee have also found possession to be a determinative factor. "Possession is also significant as a means of giving notice of rights in the goods, since notice is the basis of perfection of security interests. And possession must be measured in part by its ability to give notice." *In Re Ault*, 6 B.R. at 65; *see also AHCI, Inc. v. Short*, 878 S.W.2d 112, 114 (Tenn. Ct. App. 1993) (seller divested itself of title to property at the time of the execution of the sales agreement where delivery had already taken place and the buyer was in possession of the property); *Weaver v. Ford Motor Credit Co.*, 112 B.R. 906, 912 (Bankr. E.D. Tenn. 1990) (once goods have been delivered into the possession of the buyer under a sales contract, the most the seller can retain is a security interest).

The importance of possession is acknowledged in Tenn. Code Ann. § 47-9-113, quoted earlier, which states that interests arising solely under Article 2 are governed by Article 2 "so long as the debtor does not have or does not lawfully obtain possession of the goods." In other words, "once a debtor-buyer obtains possession of the goods, lawful as against the seller, the transaction loses its overriding sales characteristics and resembles more closely a credit transaction." 8 HAWKLAND UCC SERIES § 9-113:3. The converse must be presumed to be as accurate: as long as the seller retains possession, the more the transaction retains its character as a sale subject to Article 2.

In the case before us, Villas-Afloat never obtained possession of Boat II or Boat III because it did not pay for them, a requirement of delivery. However, Conister does not base its position on any argument that Villas-Afloat had ownership, title or possession to Boat II. Instead, it alleges, "Villas-Afloat acquired rights when it placed the order, thereby entering into contracts for the

purchase of the boat, and when it paid money to BCA pursuant to this contract," without specifying the nature or legal source of those rights. Because the allegation is that the rights arose by virtue of the sales transaction, we interpret the statement as referring to contractual rights or rights and remedies available under Article 2.

Where the claimed security interest relates to a sale of goods, the questions of whether the debtor has rights in the collateral, and the extent of those rights, should be determined by reference to Article 2 and with reference to the policies underlying it. *Trust Co. Bank v. The Gloucester Corp.,* 643 N.E.2d 16, 18 n.6 (Mass. 1994) (citing 8 ANDERSON, UNIFORM COMMERCIAL CODE § 9-203:44, at 688 (3d ed. 1985) and *Johnson v. Conrail-Amtrak Federal Credit Union*, 37 U.C.C. Rep. Serv. 933, 942 (D.C. Super. 1983)); *Manger v. Davis*, 619 P.2d 687, 690 (Utah 1980); *Heidelberg Eastern, Inc. v. Weber Lithography, Inc.*, 19 UCC Rep. Serv. 2d 767, 769 (N.Y. Sup. 1992). "In general, the debtor's 'rights in the collateral' are determined not by Article 9, but by Articles 2, 2A, by the common law, and by other rules." WHITE & SUMMERS, *supra,* at § 31-6, at 127.

We have previously identified the only applicable buyer's interests in Article 2: the right to restitution of partial payments and a special property in the goods. The question is whether these identified remedies are sufficient to grant Conister an attached security interest. The partial payment made by Villas-Afloat gave it a right to restitution of that portion of its payments that remained after the seller's resale and recoupment of damages, under Tenn. Code Ann. §§ 47-2-718(2) and (3), as discussed above. We do not, however, equate a right to restitution of payments to rights in the collateral. First, a breaching buyer's rights in moneys remaining after resale of goods arises only after the goods (or collateral under Article 9) have been disposed of by the seller. Thus, the remedy was not intended to have any application to the goods themselves. Second, a number of courts have ruled that a seller's right to reclaim goods when payment is dishonored after delivery to buyer does not include the right to recovery of proceeds from the resale of those goods. *See*, *e.g. In re Coast Trading Co.*, 744 F.2d 686, 691 (9th Cir. 1984) (citing prior precedent on issue); *Morken v. Kunkel*, 182 B.R. 1007 (Bankr. D. Minn. 1995). We think the reasoning of those courts is applicable here. Where the UCC speaks only of goods, proceeds are not included. Logically, then, where the UCC grants an interest in money generated from the sale of goods, that interest does not extend to the goods themselves. Therefore, Villas-Afloat's interest in restitution of its partial payments is not a "right in the collateral" sufficient to create an enforceable security interest in Conister.

The remaining question, therefore, is whether the "special property" in Boat II acquired by Villas-Afloat pursuant to Tenn. Code Ann. § 47-2-501, discussed above, constitutes "rights in the collateral" sufficient to give Conister a security interest. We believe any consideration of that issue must begin with the UCC's discussion of the nature of the "special property." As explained earlier, the UCC clearly states that a special property is not a security interest. Thus, it could not have bestowed on Villas-Afloat a security interest in Boat II that Villas-Afloat could convey to Conister. Comment 3 to Tenn. Code Ann. § 47-2-401 states that the incidents of a special property of the buyer "are defined in the provisions of this Article [Chapter] such as those on the rights of the seller's creditors, on good faith purchase, on the buyer's right to goods on the seller's insolvency, and on the buyer's right to specific performance or replevin."

Thus, the incidents of a special property are specifically limited to those given explicitly by a provision in Article 2. The only rights given directly to a buyer with a special property are very limited.[22] For example, such a buyer who has made partial payments may recover the goods from an insolvent seller within ten days of the payment. Tenn. Code Ann. § 47-2-502. That right to recover the goods, however, is contingent upon tender of the full purchase price. Villas-Afloat made no such tender here and consequently was ineligible to exercise the sole remedy given by the UCC to a buyer holding a special property.[23] We fail to see how a limited remedy afforded to non-breaching buyers, unexercised in this case prior to the resale of Boat II, can constitute "rights in the collateral" sufficient to create a security interest. *See Graphic Arts Centre, Inc.*, 859 S.W.2d at 865, discussed below.

In a few cases, courts have found that a special property, when coupled with possession, was sufficient to constitute rights in the collateral. As explained by the Massachusetts Supreme Court in *Trust Co. Bank v. The Gloucester Corp.*, 643 N.E.2d 16 (Mass. 1994), this reasoning begins with the proposition that possession alone is generally not sufficient.

> While a debtor's mere possession of goods usually is not enough to satisfy the "rights in the collateral" requirement of § 9-203(1)(c), "the cases generally hold . . . that where a debtor gains possession of collateral pursuant to an agreement endowing him with any interest other than naked possession, the debtor has acquired such rights as would allow [a] security interest to attach. . . ." Consistent with this standard, it has been held that, a debtor's possession of goods with contingent rights of ownership, gives the debtor "rights in the collateral."

*Id*. at 17-18 (citations omitted). The court found that delivery to the debtor buyer of the goods gave the debtor rights in the collateral because there had been identification of the goods to the contract, giving the buyer a special property, the delivery had been made pursuant to the sales agreement, and the buyer acquired a degree of control and authority over the goods. *Id.* at 18.

Although some courts have used language indicating that the special property given to the buyer upon identification is sufficient to create rights in goods so that a security interest may attach,[24] in each of those cases, the debtor had actual possession. *See, e.g.*, *In Re McLaughlin*, 183 B.R. 171,

---

[22]*Graphic Arts Centre*, 859 S.W.2d at 865; *Crocker Nat'l Bank v. Ideco Division of Dresser Indus., Inc.*, 839 F.2d 1104, 1108 (5th Cir. 1988); 3 R. ANDERSON, UNIFORM COMMERCIAL CODE, § 2-501:16, at 612 ("by virtue of the special property of the buyer in the identified goods he may, even though title has not passed to him, recover the goods in the event of the seller's insolvency, or upon the seller's default or repudiation, and he has a limited right to recover goods by replevin").

[23]Conister also did not tender full payment after notice from BCA.

[24]In support of such statements, those courts have generally relied on treatises, such as 1 Gilmore, Security Interests in Personal Property, § 11.5, at 353 (1965).

173 (Bankr. W.D. Wis. 1995); *In Re McFarland*, 112 B.R. 906, 908 (Bankr. E.D. Tenn. 1990) (considering whether security interests held by creditor were preferential transfers under the Bankruptcy Code).

However, in cases where the seller retained possession, the conclusion has been different. For example, in *Central Prod. Credit Ass'n v. Hopkins*, 810 S.W.2d 108, 113 (Mo. Ct. App. 1991), the court held that for a security interest to attach, a debtor must have some degree of control or authority over the goods placed in the debtor's possession. While supposing that it could be argued that the buyer acquired a special property, arising upon identification of the goods to the contract, the court concluded that such an interest is not sufficient, without possession, to permit attachment of the creditor's security interest. *Id*. at 113-14. Because the debtor never acquired possession, it never acquired any rights or interest in the goods, therein cattle. "A holding that [debtor] could transfer a security interest to the plaintiff would contravene the general principle that one cannot encumber another person's property." *Id.* at 114.

In *Graphic Arts Centre, Inc.*, the Missouri Court of Appeals found that the debtor never had actual or constructive possession. The court also considered the effect of identification of the goods to the contract, the event which gives rise to the "special property," beginning with the principle that identification serves a limited function. The special property and insurable interest given to the buyer upon identification allows the buyer a limited right to recover the goods. 859 S.W.2d at 865. The court found:

> However, these remedial rights derived from identification are available only upon misconduct by the seller. Here, buyer, rather than seller, failed to fully perform under the contract. Thus, these remedial provisions are unavailable to [debtor-buyer] and [its creditor] and therefore fail to provide them the requisite "rights in the collateral."
> . . . Identification by itself does not confer "rights in the collateral" . . . .

*Id.* (citations omitted).

We have found no instance wherein a court has found that a buyer's special property is, in and of itself, without possession, sufficient to create "rights in the collateral." The Fifth Circuit dealt with the issue in the context of a seller who retained possession in *Crocker Nat'l Bank,* wherein a buyer contracted to purchase forty oil rigs from the seller who was to manufacture them. The buyer later canceled the order, and the rigs were never delivered, although seller maintained that buyer was obligated to pay for them because the manufacturing process was too far along when buyer attempted to cancel. 839 F.2d at 1106. The buyer and seller eventually settled their differences, but upon buyer's insolvency, buyer's creditor who had a perfected security interest in buyer's inventory asserted it was entitled to recover the rigs. The court first determined that the seller, who retained

title and possession to goods, held a perfected purchase money security interest in the goods, pursuant to UCC §§ 2-401, 9-107, and 9-305.[25]

In addressing the creditor's assertion that its debtor, the buyer, had acquired rights in the collateral sufficient for the creditor's security interest to attach because upon identification of the goods to the contract the buyer was given a special property in the rigs, the court explained the relationship of possession to special property. That explanation, being particularly relevant to the situation before us, bears quotation at some length:

> The Uniform Commercial Code does not define the term special property interest. However, comment 3 to § 2.401 indicates that the special property interest is not a security interest but essentially relates to a purchaser's remedial rights. "[I]ts incidents are defined in provisions of the Article such as those on the rights of the seller's creditors, on good faith purchase, on the buyer's right to goods on the seller's insolvency, and on the buyer's right to specific performance or replevin."

> The Buyer and the Bank argue that because § 9.203 does not specify any minimum quantum of rights in the collateral that must be held by a debtor before a security interest can attach, the special property interest is sufficient for a security interest to attach. The parties rely on *L.B. Smith, Inc. v. Foley*, 341 F.Supp. 810 (W.D.N.Y. 1972) and *In re County Green Ltd. Partnership*, 438 F.Supp. 693 (W.D.Va. 1977), but miss the important distinction in both of those cases that the buyer had physical possession of the goods to support the attachment of a security interest.

> The court in *In re County Green* held that "the mere delivery of the appliances to the construction site for use on the construction project gave the debtor rights in the collateral for purposes of § [9.203]." 438 F.Supp. at 696. In *County Green*, the buyer actually possessed the goods and thus the case is distinguishable from the present facts.

> *L.B. Smith, Inc. v. Foley* arises in a different factual framework. There the Internal Revenue Service asserted a tax lien on two trailers delivered by the seller to the buyer pursuant to a conditional sales agreement. The buyer never made any payment to the seller for the trailers. The district court was called upon to determine the relative priorities of the IRS's tax lien and the unperfected interest of the unpaid seller. In determining whether or not the IRS's lien was perfected, the court examined the issue

---

[25]The same conclusion could be made in the case before us, that BCA held a perfected purchase money security interest in the boats. *See In Re Ault*, 6 B.R. at 67 (stating that under UCC § 2-505(1)(b) seller with possession had a perfected security interest). However, Conister does not dispute BCA's priority to proceeds from Boat II to the extent of its damages. The dispute is over disposition of the amount in excess of those damages. While Conister's claim to that money is based upon Article 9's provision regarding proceeds from collateral and, therefore, its claim to an Article 9 security interest, BCA's claim is not based on any Article 9 interest.

"whether and to what extent the taxpayer-conditional vendee had property and rights to property in the two Coastal Trailers to which the federal tax lien could attach." 341 F.Supp. at 813. The court concluded that "whatever the full nature of this 'special property' interest in the buyer, it is of a nature sufficient to permit attachment of a lien by the buyer's creditor." *Id.* Although the court did not discuss the buyer's possession of the trailers, that change of possession to the buyer did occur and the opinion must be read and construed in light of the buyer's possession.[26]

In *In the Matter of Samuels & Co*., 526 F.2d 1238 (5th Cir.) (en banc), *cert. denied*, 429 U.S. 834, 97 S.Ct. 98, 50 L.Ed.2d 99 (1976), this court focused on the importance of possession in determining the relative rights of parties claiming a security interest in property. The opinion addressed the following question: is the interest of an unpaid cash seller in goods already delivered to a buyer superior or subordinate to the interest of a bank, the holder of a perfected security interest in those same goods? *Id.* at 1241. This court held that the buyer had the right to encumber the goods upon their delivery having obtained that right upon acquiring possession of the goods. The decision rested upon possession. Indeed, as the opinion made clear, the bank's security interest attached *only* as a direct result of the seller's voluntary act of delivery of the cattle to the buyer without reserving any written security interest. *Id.* at 1247. *See Interfirst Bank of Abilene, N.A. v. Lull Mfg*., 778 F.2d 228, 233 (5th Cir.1985).

This case is different from *Samuels.* The Seller never delivered the rigs to the Buyer. Nevertheless, the analysis in *Samuels* is important here because it demonstrates the important role of possession in determining rights in collateral. *See Kinetics Technology Int'l Corp. v. The Fourth Nat'l Bank of Tulsa*, 705 F.2d 396 (10th Cir. 1983), where the court held that for a security interest to attach, a debtor must have some degree of control or authority over collateral placed in the debtor's possession.

The Seller in this case retained possession of the rigs at all times, thus preserving a purchase money security interest in them. The Buyer never paid for the rigs and

---

[26] The text of the footnote in the opinion is:

*L.B. Smith, Inc. v. Foley* is the basis for the statement that "a debtor has rights in the collateral if he *** is a buyer with special property rights in goods by virtue of U.C.C. § 2-501, even though he has not yet acquired title under U.C.C. § 2-401 * * *." 8 ANDERSON, UNIFORM COMMERCIAL CODE § 9-203.45. The other case relied upon by Anderson for this proposition, *Holstein v. Greenwich Yacht Sales, Inc*., 122 R.I. 211, 404 A.2d 842 (1979), is also distinguishable from this case. There the Rhode Island court held that the special property interest acquired by the buyer of an undelivered sailboat was superior to the security interest of the seller's floor-plan financer. *Holstein*, however, is distinguished because it did not determine the rights of the buyer as against the seller/holder of a purchase money security interest in the goods. Retention of possession was not an issue in *Holstein*, while it is central to the rights of the parties here.

never acquired any control over them. A holding that the Buyer could transfer a security interest to the Bank would contravene the general principle that one cannot encumber another person's property. *See Kinetics Technology Int'l Corp.*, 705 F.2d at 398. As the district court noted, "[i]t would astonish the sellers of the world to discover that a seller who has not parted with goods nor received payment for them has an interest in the goods inferior to the creditor of a holder of an executory contract to buy them." Such a holding would offend the commercial expectations of all sellers who retain possession of goods to protect themselves against a defaulting buyer.

We thus hold that where the seller has never relinquished possession of the goods the special property right of § 2.401 in and of itself does not constitute a sufficient right in the collateral to enable a buyer who has not paid for those goods to transfer a security interest in them to a third party.

*Crocker Nat'l Bank*, 839 F.2d at 1108-09; *see also Heidelberg Eastern, Inc.*, 19 UCC Rep. Serv. 2d at 770 (citing *Crocker Nat'l Bank* with approval for principle that "the requirement of UCC 9-203(1)(c) that a debtor have rights in the collateral is a reflection of the general principle that one cannot encumber another's property. . ." and holding the UCC "embodies a policy of protecting the priority of a seller's . . . interest . . . .").

For the reasons stated above, and in particular reliance on *Crocker Nat'l Bank*, whose reasoning and result we adopt, we find that Villas-Afloat never acquired rights in the collateral sufficient to meet the requirement for attachment of any security interest in Conister. Therefore, Conister cannot rely on any Article 9 interest to enforce its claimed right to proceeds, and Tenn. Code Ann. § 47-9-504(1) does not apply to the dispute.[27]

---

[27]Because the only right Villas-Afloat could convey was an interest based on its position as a buyer making partial payments under Article 2, its interest is one "arising solely under the chapter on sales (chapter 2 of this title)" and consequently, "the rights of the secured party on default by the debtor are governed by the chapter on sales (chapter 2 of this title)." Tenn. Code Ann. § 47-9-113(c).

## IV. Rights Which Were Conveyed

Although Villas-Afloat did not have sufficient rights in the collateral to create an attached security interest to Conister under Tenn. Code Ann. § 47-9-203(1)(c), it was nevertheless able to convey to Conister what rights it had under the agreement with BCA or under Article 2.

> Sometimes courts use the "rights in the collateral" requirement as a way of limiting the scope of the security interest, vis à vis prior claimants. Thus, an expansive security interest in goods granted by the lessee of such goods nevertheless rises no higher than the lessee's rights and thus is not superior to the lessor's rights. . . .
>
> Viewed in that way, "rights in the collateral" language merely states a truism, namely, that the debtor normally can only convey something once it has something, and that something may be less than the full bundle of rights that one may hold in such property. The "rights in the collateral" language is a gateway through which one looks to other law to determine the extent of the debtor's rights, and thus the interest the debtor can grant to a third party by way of a security interest.

WHITE & SUMMERS, *supra*, § 31-6, at 126-27.

The question really is what rights a breaching buyer may pass on to a creditor. We agree with the following analysis:

> A secured party (or other property claimant) may hold rights that are derived from the debtor and yet may nonetheless find that he enjoys no greater rights against the "owner" of the goods than does the debtor himself. As long as the rights of the secured party (or other property claimant) to the collateral remain only derivative of the debtor's, the "rights in the collateral" issue seems largely uncontroversial. Regardless of whether the rights in the collateral are asserted by the debtor are those of the holder of a "special property interest" in the goods or of "title" to the goods, the debtor has *some* rights in the collateral. However limited those rights may be, there is no reason that a secured party (or other property claimant) should not be able to succeed to them.

Baird & Jackson, *supra*, 35 STAN. L. REV. at 203.[28]

---

[28]The example given by these authors is illustrative:

For example, assume that Boeing leases aircraft to Pan Am on twenty-year leases at $100,000 per month. Does Pan Am enjoy "rights in the collateral" sufficient to pass on to a third party a security interest in the aircraft? If we assume that Boeing's consent to an assignment of the leases is not required, the answer seems to be yes. *See, e.g., In re Holiday Airlines Corp.*, 647 F.2d 977 (9th Cir.

(continued...)

Thus, we conclude that Villas-Afloat could only convey to Conister those interests or rights it had. Because the dispute herein is over the proceeds from the sale of Boat II, the relevant right so conveyed was Villas-Afloat's right to restitution of that portion of its partial payments which exceeded BCA's costs and damages.

## V. Resolution of Competing Claims to Excess Proceeds from Boat II

The outcome of the conflicting claims to the $48,889.85 depends upon an analysis of the rights and interest of the two parties under Article 2 and other applicable state law. Tenn. Code Ann. § 47-1-103: *Haverlah v. Memphis Aviation, Inc.*, 674 S.W.2d 297, 306-07 (Tenn. Ct. App. 1984). Villas-Afloat had, and conveyed to Conister, a right to restitution under Tenn. Code Ann. § 47-2-718(2), which translates to claim for the $48,889.85 minus $500. On the other hand, BCA has a claim against Villas-Afloat arising from its rights as a seller under Article 2 and claims a right to setoff its losses on Boat III against the same money. Article 2 provides no guidance on resolving the dispute, but is the source of the debts claimed by each. We resort, therefore, to the law of setoff. *Haverlah,* 674 S.W.2d at 306-07.

The fundamental philosophy of all setoffs and recoupments is that a party being sued for money may claim entitlement to money from the party bringing the suit, permitting the adjudication of countervailing claims in one suit.

> A set-off is a counterdemand which a defendant holds against a plaintiff, arising out of a transaction extrinsic of plaintiff's cause of action. It is the right which exists between two parties, each of whom under an independent contract owes an ascertained amount to the other, to set-off their respective debts by way of mutual deduction, so that in any action brought for the larger debt the residue only, after deduction, may be recovered. The right of set-off is a common-law right, which

---

[28](...continued)
1981). But to say that a third party can obtain a security interest in the aircraft is not to say that its security interest entitles it to prevail against Boeing. Rather, "attachment" of the third party's interest means nothing more than that upon Pan Am's default against the third party, the latter can assert whatever rights Pan Am enjoys in the aircraft against Boeing. The secured party may take possession of the aircraft by stepping into the shoes of Pan Am and assuming both its rights and obligations under the lease. The secured party will acquire not the aircraft but rather Pan Am's right to use them. Assuming that the secured party's rights to the aircraft are but derivative of Pan Am's, when Pan Am loses its right to possess the aircraft as against Boeing, so too will the secured party lose its rights to possess the aircraft as against Boeing. Because Pan Am has the right to use the airplanes only if it pays Boeing $100,000 a month, the secured party will be able to use the airplanes only if it pays Boeing the same amount. Thus, the right the third party acquires to secure its debt (the right to rent airplanes from Boeing at $100,000 a month) will prove valuable only if the $100,000 rental price is below the prevailing market rate for airplanes of that type at the time of Pan Am's default.

*Id*. at n.85.

belongs to every creditor, to apply unappropriated monies of his debtor, in his hands, in extinguishment of debts due to him. It allows parties that owe mutual debts to each other to assert amounts owed, subtract one from the other, and pay only the balance.

80 C.J.S. *Set-off and Counterclaim* § 3 (2000) (footnotes omitted).

"[A]ny claim or demand the defendant may have against the plaintiff may be used as a set off, while it is not a subject of recoupment unless it grows out of the very same transaction which furnishes the plaintiff's cause of action." *Howard v. Abernathy*, 751 S.W.2d 432, 434 (Tenn. Ct. App. 1988). Thus, whether BCA's arrangement with Villas-Afloat is treated as one contract or as three, BCA is entitled to claim a right of setoff.[29] *See also* Tenn. R. Civ. P. 13.02 (allowing as permissive counterclaims "any claim against an opposing party, whether or not arising out of the transaction or occurrence that is the subject matter of the opposing party's claim.").

In *In Re Paul Pack Steel Erection Co., Inc.*, 126 B.R. 310 (Bankr. E.D. Tenn. 1991), the court was called upon to determine whether a creditor contractor could setoff against retainages it was holding the total amount due to the contractor from a now bankrupt subcontractor under three separate subcontracts. The bankruptcy trustee objected to using the entire retainage from the third contract to setoff the claims resulting from the first two contracts. The court determined that retainage on a subcontract was simply a debt owed by the contractor to the subcontractor and, as such, was subject to the common law rules of setoff. Consequently, the contractor creditor was entitled to setoff the retainage from one contract against debts owed it by the subcontractor arising from all three subcontracts. *Id.* at 312.

A setoff must be a valid claim for which the defendant might have sued the plaintiff and recovered. *Howard*, 751 S.W.2d at 434. In other words, a setoff claim must be sufficient to support an independent action by the defendant against the plaintiff. *Combustion Eng'g Co. v. McFarland*, 209 Tenn. 75, 349 S.W.2d 138 (1961). An essential requirement to a right of setoff is that the demands, or claims, are mutual, that is subsisting between the same parties. *Auton's Fine Jewelry & Bridal Center, Inc. v. Beckner's, Inc.*, 707 S.W.2d 539, 540 (Tenn. Ct. App. 1986) (citing *Edington v. Pickle*, 33 Tenn. 122 (1853)). Additionally, the reciprocal claims "must be of the same grade and nature or be due in the same capacity or right." *Id.* The right to setoff is available to assert claims only to liquidated damages or those capable of being ascertained by calculation. *Howard*, 751 S.W.2d at 434.

A remedy provided by Article 2 can be the basis of a setoff claim. *First Tenn. Bank Nat'l Ass'n v. Hurd Lock & Mfg. Co.*, 816 S.W.2d 38, 41 (Tenn. Ct. App. 1991). In *Hurd Lock*, a buyer was allowed to set off its Tenn. Code Ann. §§ 47-2-714 and -715 damages against amounts it owed

---

[29]BCA argues that the boats were built pursuant to an installment contract between BCA and Villas-Afloat; Conister argues there were separate contracts, at least with regard to Boat II and Boat III. The trial court found "Boating Corporation of America contracted with Villas-Afloat to build a series of boats, that three boats were built."

under the sales contract. Because the damages incurred by the buyer were greater than the amounts due under the contract, the seller's secured creditor was not entitled to any amount from the buyer.

The claim by BCA for its damages arose from its rights and remedies under Article 2 of the UCC because of the breach by Villas-Afloat in failing to pay for the boats it contracted to buy. Conister's claim rests on the rights transferred to it by Villas-Afloat, and Villas-Afloat had a claim for restitution of partial payments for Boat II also found in Article 2. Thus, we find there is mutuality of parties and the claims are of the same nature. Because the UCC creates the formula for calculation of both claims, they were both capable of being ascertained by calculation and were, in fact, so calculated before the lawsuit was brought by Conister. Therefore, BCA has met the requirements for asserting a valid claim of setoff against Villas-Afloat.

This court has also allowed a party to assert a claim of setoff where "complete justice and equity cannot be meted out to the parties" otherwise. *Haverlah*, 674 S.W.2d at 307; *Moore v. Howard Pontiac-Am., Inc.*, 492 S.W.2d 227, 230 (Tenn. Ct. App. 1972). In other words, there is no reason to subject the parties to two lawsuits when they have claims against each other. *See also ECHO, Inc. v. Whitson Co., Inc.*, 52 F.3d 702, 704 (7th Cir. 1995) (In allowing buyer to assert counterclaims against the seller who brought suit to collect money owed from the sale of goods, which counterclaims where based on a separate distribution agreement, the court stated "The real point is that only the resolution of the counterclaim will ultimately determine how much money each party owes each other.").

It does not change the outcome of the case that for some period of time after the sale of Boat II BCA indicated that the $48,889.85 belonged to Villas-Afloat. After Boat III was sold, BCA realized a net loss in its dealings with Villas-Afloat. It subsequently determined that it would apply the proceeds from the $48,889.85 to the money Villas-Afloat owed it on Boat III. Although the right of setoff is an exercisable prerogative, not a natural right conclusively established because the parties have claims against one another, *In re Holder*, 182 B.R. 770, 776 (Bankr. M.D. Tenn. 1995), BCA exercised that right, asserted its claim to setoff in a timely manner, and did not waive it. The court had authority to allow the claimed setoff. Tenn. Code Ann. § 25-1-105; *McReynolds v. Cherokee Ins. Co.*, 815 S.W.2d 201, 206 (Tenn. Ct. App. 1990).

The party asserting a claim to setoff has the burden of establishing its right to setoff. *Polk v. Torrence*, 218 Tenn. 680, 683, 405 S.W.2d 575, 576 (1966). BCA has proved its losses and the claims it had against Villas-Afloat. In fact, Conister does not dispute the amounts or that Villas-Afloat was liable to BCA for its damages. Further, setoff is an equitable doctrine, and generally rests in the inherent authority of the court to do justice to the parties before it and, therefore, will not be allowed where to do so would work injustice. *Auton's Fine Jewelry & Bridal Center, Inc.*, 707 S.W.2d at 540. We find nothing about the situation before us which indicates that allowance of BCA's right of setoff would be inequitable. BCA performed all its obligations under its agreement with Villas-Afloat and took reasonable steps to recover its losses. Conister, a lending institution, made a loan to Villas-Afloat which later proved to have been improvident, but failed to take the steps necessary to insure its loan would be secure before delivering the proceeds of the loan.

Therefore, we conclude that BCA was entitled to setoff the amount owed it by Villas-Afloat against the money left after the resale of Boat II. There is sufficient evidence in the record to prove that the amount of BCA's setoff exceeds the $48,889.85. In essence, our conclusion is the same as the trial court's: there were no excess proceeds.

## VI. Conister's Non-Derivative Claims

In addition to its claim to the proceeds from the sale of Boat II based upon its assertion of an attached security interest, and in addition to those rights derived from Villas-Afloat, Conister makes other claims which we interpret as not deriving from Villas-Afloat. These claims begin with the assertion that communications from Conister to BCA made contemporaneously with its wire of the proceeds of its loan to Villas-Afloat restricted application of those funds to Boats I and II. The only communication contemporaneous with delivery of the funds was the fax which simply referenced, in the subject line, two invoices by number. There was a telephone conversation to confirm the details of the process for wiring the money, but there was no testimony that anything else of substance took place in that conversation. The trial court held:

> The evidence is insufficient for the Court to find that Conister Trust gave any written instructions or verbal instructions to Boating Corporation of America on the use of the funds or on any limitation of the funds. One cannot read the fax which confirms the wiring of the 200,000 pounds with reference to the invoice numbers on the first two boats as a limitation on the application of those funds.

Conister asserts the trial court's holding was in error. We cannot agree. The evidence does not preponderate against the trial court's factual finding.

In addition, Conister recounts numerous statements from BCA officials acknowledging the entitlement of Villas-Afloat and/or Conister to the $48,889.85 remaining after the resale of Boat II. We do not interpret these statements as supporting any argument that Conister actually or effectively limited use of the funds it loaned Villas-Afloat to Boats I and II. As set out earlier, after the sale of Boat II on November 26, 1990, BCA considered the $48,889.85 as surplus from the sale and made no claim to that money. In fact, BCA offered to forward the money to the proper party upon receipt of joint payment instructions. BCA sold Boat III in late December of 1990. Conister claims that BCA made similar statements disclaiming interest in the proceeds from Boat II and carried that amount as a credit balance on its books for some time after the sale of Boat III. BCA asserts that it did not realize the full extent of its losses in its dealings with Villas-Afloat until "the dust settled" and that the issues resolved in determining the entitlements to the money were complex. We note that Conister did not initiate this litigation until August of 1994, and the record would indicate there had been silence between the parties from early 1991.

These factual allegations concerning the contemporaneous communications and subsequent statements appear to be the basis, in part, for the equitable arguments made by Conister. Conister argues that, even if it does not have a superior interest to the proceeds of the sale of Boat II via a

security interest, it is still entitled to the money under the doctrines of constructive trust and equitable lien. As foundation for this argument, Conister states that BCA knew that Conister only funded Boats I and II and was not involved with Boat III, but BCA still applied $25,000, of Conister funds towards Boat III and offset its loss on Boat III with the surplus from Boat II. Therefore, Conister argues, it is entitled to both the $25,000 deposit on Boat III and the $48,889.85 surplus on Boat II.

To clarify, we point out that the $25,000 that is the subject of Conister's claim is the amount BCA applied, at the direction of Villas-Afloat, as a deposit on Boat III. Conister's claim that BCA was not entitled to so apply that amount rests upon its claim that BCA was restricted in its use of the funds wired by Conister. This argument, however, overlooks the fact that Villas-Afloat had supplied an initial $25,158 as a deposit. Conister's argument in this regard lacks an evidentiary basis that the money used as a deposit on Boat III was part of the money wired by Conister.

Additionally, and more significantly, Conister's argument that BCA could not apply either the $25,000 or the $48,889.85 in proceeds from the sale of Boat II contains two defects. First, the money wired to BCA was money loaned to Villas-Afloat and was no longer Conister's money. The fact that Conister made the transfer instead of giving the money to Villas-Afloat to make the payment does not alter the fact that the money was Villas-Afloat's and was sent to BCA at the direction of Villas-Afloat. While Conister could put conditions on the use of the money by Villas-Afloat, it had no relationship with BCA through which it could impose such conditions on BCA. Second, as we have determined earlier, BCA was entitled to the remedies afforded under the UCC and to offset its total damages against amounts paid to it by Villas-Afloat. These problems doom Conister's final two claims.

## A. Constructive Trust

Conister argues that this court should apply the principle that "when one acquires property with notice that another is entitled to its benefits, equity constructs a trust out of the transaction and makes a trustee of the person thus acquiring title" citing *Browder v. Hite*, 602 S.W.2d 489 (Tenn. Ct. App. 1980). As such, BCA was the trustee as to both the $25,000, deposit and the $48,000, surplus. Implicit in Conister's argument is that this case satisfies the criteria for the imposition of a constructive trust. We disagree.

Constructive trusts arise through equity to satisfy the demands of justice. *Rowlett v. Guthrie*, 867 S.W.2d 732, 734 (Tenn. Ct. App. 1993); *Akers v. Gillentine*, 191 Tenn. 35, 39, 231 S.W.2d 369, 371 (1948). A constructive trust arises against one who:

> . . . by fraud, actual or constructive, by duress or abuse of confidence, by commission of wrong, or by any form of unconscionable conduct, artifice, concealment, or questionable means, or who in any way against equity and good conscience, either has obtained or holds the legal title to property which he ought not, in equity and good conscience hold and enjoy.

*Livesay v. Keaton,* 611 S.W.2d 581, 584 (Tenn. Ct. App. 1980) (citation omitted). Tennessee courts have found constructive trusts in several situations, and included among them is "where a person acquires property with notice that another is entitled to its benefits." *Myers v. Myers*, 891 S.W.2d 216, 219 (Tenn. Ct. App. 1994). This ground includes a requirement that the party seeking to impose a constructive trust must own the property in question or have a beneficial interest in it. *Browder*, 602 S.W.2d at 493. A constructive trust is a device used by courts applying equitable principles "to compel one who unfairly holds a property interest to convey that interest to another to whom it justly belongs." *Akers*, 191 Tenn. at 39, 231 S.W.2d at 371 (citation omitted). Finally, to establish a constructive trust the proof must be "'clear, cogent, convincing, and irrefragable.'" *Browder*, 602 S.W.2d at 493 (citing *Cook v. Cook,* 521 S.W.2d 808 (Tenn. 1975); *Seaton v. Dye*, 37 Tenn. App. 323, 263 S.W.2d 544 (1953)); *see also Linder v. Little*, 490 S.W.2d 717 (Tenn. Ct. App. 1972).

In the case herein, we find that a number of the prerequisites for a constructive trust do not exist. BCA has not engaged in the type of conduct required; Conister was not entitled to the "property" at issue; and Conister received the benefits its was entitled to, in that it could assert its debtor's rights to restitution. We find no basis for the application of the equitable principles underlying the theory of constructive trust in this business arrangement wherein both Conister and BCA had available remedies to protect their interests.

### B. Equitable Lien

Similarly, we find that the doctrine of equitable lien does not apply to the circumstances herein. An equitable lien is a right of a special nature over property which constitutes a charge or encumbrance so that the property itself may be proceeded against in an equitable action, and either sold or sequestered, and its proceeds or profits supplied on the debt of the person in whose favor the lien exists. *Shipley v. Metropolitan Life Ins. Co.*, 25 Tenn. App. 452, 158 S.W.2d 739 (1941). This court has discussed the doctrine as follows:

> An equitable lien is a right, not existing at law, to have specific property applied in whole or in part to payment of a particular debt or class of debts. It is not an estate or property in the thing itself, nor is it a right to recover the thing; that is, it is not a right which may be made the basis of a possessory action, but is merely a charge upon it. *Greer v. American Security Insurance Co.*, 223 Tenn. 390, 445 S.W.2d 904, 907 (Tenn.1969); *See Allen v. Cunningham*, 143 Tenn. 11, 223 S.W. 450 (Tenn.1919). An equitable lien arises either from a written contract which shows an intention to charge some particular property with a debt or obligation or is implied and declared by a court of equity out of general considerations of right and justice as applied to relations of the parties and circumstances of their dealings. In the absence of an express contract, a lien is based upon the fundamental maxims of equity and may be implied and declared by a court of chancery out of general considerations of right and justice as applied to the relations of the parties and the circumstances of their dealings. *Greer,* 445 S.W.2d at 907. There must be an intent to make the particular property, real or personal, a security for the obligation. *Id.* An equitable lien cannot be founded merely upon moral obligations alone, but must find a basis

in established equitable principles. *Id.;  See also  Stansell v. Roach,* 147 Tenn. 183, 246 S.W. 520 (Tenn.1922).

*Muller v. Lannom*, No. 02A01-9702-CH-00043, 1997 Tenn. App. Lexis 904, at \*14-\*15 (Tenn. Ct. App. Dec. 17, 1997) (citations omitted) (no Tenn. R. App. P. 11 application filed).  Importantly, this court has stated, "there must be an established obligation before a lien may be declared to secure it." *Shipley*, 25 Tenn. App. at 455, 158 S.W.2d at 741.

It is undisputed that there was no express contract between BCA and Conister.  BCA did not have an obligation to Conister regarding the money sent it at the direction of its buyer Villas-Afloat. Further, we find that no "fundamental maxims of equity" were triggered.  Thus, we find there was no equitable lien upon the funds.

VII.

Accordingly, the decision of the trial court is affirmed and the case is remanded for such proceedings as are necessary.  Costs of this appeal are taxed to Appellant, Conister Trust Ltd., for which execution may issue if necessary.

_____
PATRICIA J. COTTRELL, JUDGE